**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

DARRYL ANDRES ESCALANTE,   )   NO. CV 02-7711 AHM (FMO)
                  )
          Petitioner,   )
                  )
    v.              )   **REPORT AND RECOMMENDATION OF**
                  )   **UNITED STATES MAGISTRATE JUDGE**
RANDY GROUNDS, Warden,   )
                  )
          Respondent.   )
_____)

     This Report and Recommendation is submitted to the Honorable A. Howard Matz, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

<u>**INTRODUCTION**</u>

     Petitioner is a California state prisoner incarcerated at the Correctional Training Facility in Soledad, California.  On October 3, 2002, petitioner, proceeding <u>pro se</u>, filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition") pursuant to 28 U.S.C. § 2254.  On February 18, 2003, respondent[1] filed a Return to the Petition ("Return").  On March 31, 2003, petitioner filed his Traverse to the Return ("Reply").

---

     [1] Randy Grounds, Warden at the Correctional Training Facility in Soledad, California, is substituted for his predecessor.  <u>See</u> Fed. R. Civ. P. 25(d).

On April 6, 2006, the court issued a Report and Recommendation ("R&R"), bifurcating petitioner's case into two phases: (1) litigation of Grounds Two and Three in the Petition (Phase One); and (2) litigation of Ground One in the Petition (Phase Two).  In the R&R, the court addressed Phase One and recommended that Grounds Two and Three be denied with prejudice.[2]

On February 27 and 28, 2007, an evidentiary hearing was held ("Evidentiary Hearing"), at which petitioner and counsel for both parties were present.  (1 Reporter's Transcript of Evidentiary Hearing ("ERT") at 4).  On May 18, 2007, petitioner filed a Memorandum of Points and Authorities in Support of Petitioner's [Proposed] Findings of Fact and Conclusions of Law ("Petr's Memo").  On June 20, 2007, respondent filed a Post-Evidentiary Hearing Briefing ("Resp's Memo").  On July 18, 2007, petitioner filed a Post-Hearing Reply Brief ("Supp. Reply").

Briefing having been completed, the matter has been submitted and is now ready for decision as to Phase Two.  Having reviewed the allegations in the Petition and the matters set forth in the record, it is recommended that Ground One in the Petition be granted.

## PRIOR PROCEEDINGS

On August 23, 1999, after a jury trial in the Los Angeles County Superior Court (Case No. BA129067), petitioner was convicted of four counts of willful, deliberate and premeditated attempted murder (Cal. Penal Code §§ 187 & 664).  (Clerk's Transcript ("CT") at 277-80, 284-86 & 329-30).  The jury also found true the allegations that, in committing the crimes, petitioner personally used a firearm (Cal. Penal Code §§ 1203.06(a)(1) & 12022.5(a)).[3]  (CT at 277-80 &

---

[2] Contemporaneously with the filing of the R&R, the court issued an Order appointing the Federal Public Defender to represent petitioner in Phase Two.  (Court's Order of April 6, 2006, at 2).

[3] Petitioner was tried with co-defendant Alex Arturo Pagan ("Pagan"), who was convicted of one count of second-degree murder (Cal. Penal Code § 187) and one count of willful, deliberate and premeditated attempted murder (Cal. Penal Code §§ 187 & 664), as well as related firearm-use enhancements.  (CT at 275-76, 281-82 & 327-28; Reporter's Transcript at 2402 & 2404-05).  The instant trial was the second for both petitioner and Pagan, as their earlier convictions were reversed on appeal due to prosecutorial error.  (See CT at 2-10; Return, Exh. D at 110); (CT at 4 & 5) (ruling that the prosecutor's misleading argument on reasonable doubt "constituted reversible prosecutorial 'error[]'").  Unless otherwise stated, all references to "trial" herein refer to petitioner's second trial.

1   284-86).  On September 28, 1999, the trial court sentenced petitioner to an indeterminate term of

2   life with the possibility of parole, plus a consecutive determinate term of four years.  (CT at 324-26

3   & 329-30).

4         Petitioner appealed his conviction and sentence to the California Court of Appeal.  (CT at

5   334).  In an unpublished opinion filed on June 29, 2001, the court of appeal affirmed the trial

6   court's judgment in full.  (Return, Exh. D ("Opinion") at 109 & 135).  Petitioner then filed a petition

7   for review in the California Supreme Court, which was denied on October 10, 2001, without

8   comment or citation to authority.  (Id., Exhs. E-G).

9         Thereafter, petitioner filed a petition for writ of habeas corpus in the Los Angeles County

10   Superior Court, which was denied on July 11, 2002.  (Petition at 5).

11         Petitioner filed the instant Petition on October 3, 2002.

12   **SUMMARY OF FACTS**

13         The facts underlying petitioner's convictions are not in dispute in these proceedings.

14   Accordingly, the court will quote directly from the California Court of Appeal's statement of facts

15   in its opinion affirming petitioner's convictions.

16         On the night of February 12, 1994, two gunmen the jury found were

17   Pagan and [petitioner] fired shots at a group of rival gang members.  James

18   Zamora was killed by a .38 or .357 caliber bullet to the back of his head.

19   Zamora was armed but never fired his gun.  Zamora's girlfriend Melissa

20   Perez was hit in the hand.  Zamora and his girlfriend were standing outside

21   a residence and talking to Hazel Perez (Melissa's sister), Julio Pivaral, and

22   Terri Salas.  Hazel, Pivaral, and Salas were sitting in Salas' parked car.

23         Police recovered six expended .25 caliber bullet casings and one live

24   .22 caliber bullet from the scene.  They also recovered three spent bullets

25   from inside Salas' car, two spent bullets elsewhere at the crime scene, and,

26   during his autopsy, the bullet that killed Zamora.  Two of the recovered

27   bullets, including the one that killed Zamora, were fired from the same .38 or

28

.357 caliber gun.  Three of the recovered bullets and all the recovered ejected shell casings were fired from the same .25 caliber gun.

The primary prosecution witness was Byron Paredes.  Paredes drove Pagan and [petitioner] to and from the crime scene, and was standing near them when the shots were fired.  Paredes originally was charged as a codefendant.  Before the first trial, as part of a plea bargain, Paredes pled guilty to being an accessory (§ 32) and received a two year sentence. Paredes testified at the first trial.  By the time of the second trial, Paredes had completed his sentence and was no longer obligated to testify under his plea bargain, but nonetheless did so.   By the second trial, Paredes was undergoing deportation proceedings.  The prosecutor had refused Paredes' requests to expunge his conviction and write a favorable letter.  Paredes had been imprisoned for a 1979 robbery conviction.

Paredes, Pagan, and [petitioner] belonged to the Clanton Street gang. Zamora, his girlfriend, and at least one of the people in the car belonged to the rival Mid-City Stoners gang.  Until early 1994, the two gangs coexisted peacefully.  However, a dispute arose over a romantic relationship and the two gangs became rivals shortly before the shootings.  According to Paredes, on the evening of the shootings, Paredes, Pagan, and [petitioner] were at the home of fellow Clanton gang member Joe Belmonte.  Belmonte told them he had been beaten by a Mid-City Stoner and wanted a rematch.  Paredes, [petitioner], and Belmonte were in their late thirties or forties, and Pagan was in his early twenties.  Paredes and [petitioner] had been friends since junior high school.  Paredes had known Pagan for 10 years.

Paredes drove Pagan and [petitioner] from Belmonte's home to the crime scene.  Paredes claimed he did not know his companions were armed. Paredes parked when he saw Zamora, who was Paredes' friend.  Paredes told Pagan and [petitioner] to wait in the car, walked across the street, and

4

1    shook hands with Zamora.  [Petitioner] walked across the street and issued

2    a gang challenge to Zamora.  When Zamora said he belonged to the Mid-City

3    Stoners, [petitioner] pulled a gun and began shooting at Zamora.  Paredes

4    then heard another gunshot to his right.  Paredes turned and saw Pagan with

5    a gun in his hand.  Pagan's shot felled Zamora.  Zamora's girlfriend also fell,

6    shot in the hand.  (On redirect, Paredes said he did not turn when he heard

7    the second gun fire, and did not see Pagan until he walked back to his car,

8    when he saw Pagan walking in the same direction.) [Petitioner] told Paredes

9    to get in the car and drive.  Paredes drove himself, Pagan, and [petitioner]

10   away.

11        In March 1996, Melissa Perez, Zamora's girlfriend, told police

12   Paredes, Pagan, and [petitioner] walked toward her and Zamora.  Perez said

13   Pagan and [petitioner] began firing, one shooting Zamora, the other shooting

14   and wounding her and firing at Salas' parked car.  Pagan approached her,

15   put his gun to her head, and pulled the trigger, but his gun was empty.

16   Pagan said, "F--- you, b----."  Perez identified photos of Pagan and

17   [petitioner] as similar to the suspects.  At the first trial, Perez refused to

18   identify [petitioner and Pagan], saying she was afraid.  At the second trial,

19   Perez again refused to identify [petitioner and Pagan], saying she feared

20   retaliation.  She also claimed she no longer could remember how the

21   shootings happened.

22        In February 1996, Michael Bramit, who belonged to a third gang, told

23   police he was across the street when he saw Paredes drive up to the scene

24   with Pagan, [petitioner], and another man.  All four men left Paredes' car and

25   approached Zamora's group.  Bramit saw Pagan and [petitioner] fire into the

26   group. Pagan shot Zamora.  Bramit was in custody in Riverside awaiting trial

27   on an unrelated death penalty case.  Bramit identified photos of Pagan and

28   [petitioner].   Bramit told the police he was afraid any testimony could

5

1   endanger his family and himself.  At the second trial, however, Bramit, by

2   then on death row, said he fabricated Pagan's and [petitioner's] involvement

3   in a failed attempt to get favorable treatment in his murder trial.  Bramit

4   testified the shootings were by a member of a fourth street gang, and Pagan

5   and [petitioner] were not present.  Bramit gave similar testimony at the first

6   trial.

7   Perez, Bramit, and the interviewing detectives agreed the detectives

8   gave Perez and Bramit information, such as [petitioner's and Pagan's] gang

9   nicknames, during the interviews.

10   Neither [petitioner nor Pagan] presented a defense.

11  (Opinion at 111-13).

12  ### **PETITIONER'S CONTENTIONS**

13  In his Petition, petitioner challenges his conviction, (Petition at 2), and raises the following

14  claims for federal habeas relief:[4]

15  1.   The state courts erred in finding that the defense did not make a prima facie showing

16  of discriminatory use of peremptory challenges.  (Petition at 6 & Memorandum of Points and

17  Authorities[5] ("Memo") at 9-12).

18  2.   The trial court erred in failing to <u>sua</u> <u>sponte</u> instruct the jury that extrajudicial

19  identification testimony had to be corroborated in order to be sufficient to sustain a conviction.

20  (Petition at 6 & Memo at 12-16).

21  3.   The trial court erred in refusing to instruct the jury with CALJIC Nos. 2.91, dealing

22  with the burden of proof on the issue of identity, and 2.92, which lists the factors for the jury to

23  consider in weighing eyewitness identification testimony.  (Petition at 7 & Memo at 16-20).

24  / / /

25

26   [4] As noted above, <u>see</u> <u>supra</u> at 2, the court previously addressed Grounds Two and Three.

27   [5] Petitioner attached a copy of his petition for review filed in the California Supreme Court

28  to his Petition.  The court construes this attachment as a Memorandum of Points and Authorities
    in support of the Petition.

**DISCUSSION**

I.    STANDARD OF REVIEW.

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214.  Woodford v. Garceau, 538 U.S. 202, 204 & 207, 123 S.Ct. 1398, 1400 & 1402 (2003) (habeas application filed after AEDPA's effective date of April 24, 1996, is reviewed under AEDPA).  As explained by the Supreme Court, AEDPA "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court."  Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523 (2000).  The "highly deferential standard for evaluating state-court rulings [embodied in 28 U.S.C. § 2254(d)] demands that state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 360 (2002) (per curiam) (internal quotation marks and citation omitted).

Under AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – [¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [¶] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  "[C]learly established Federal law, as determined by the Supreme Court of the United States," within the meaning of 28 U.S.C. § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of t[he Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412, 120 S.Ct. at 1523; accord Lockyer v. Andrade (Andrade), 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172 (2003).  Ninth Circuit case law "may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help . . . determine what law is 'clearly established.'"  Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999, as amended Jan. 10, 2000); accord Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), cert. denied, 540 U.S. 968, 124 S.Ct. 446 (2003).

1    Section "2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent

2    meaning." Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850 (2002).  Under the "contrary to"

3    clause, "a decision by a state court is 'contrary to' [the Supreme Court's] clearly established law

4    if it 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or

5    if it 'confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme]

6    Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Price v.

7    Vincent, 538 U.S. 634, 640, 123 S.Ct. 1848, 1853 (2003)  (quoting Williams, 529 U.S. at 405-06,

8    120 S.Ct. at 1519-20); accord Andrade, 538 U.S. at 73, 123 S.Ct. at 1173.

9    "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

10   the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions

11   but unreasonably applies that principle to the facts of [petitioner's] case." Williams, 529 U.S. at

12   413, 120 S.Ct. at 1523; Andrade, 538 U.S. at 75, 123 S.Ct. at 1174.  A federal court making the

13   "unreasonable application" inquiry asks "whether the state court's application of clearly established

14   federal law was objectively unreasonable."   Williams, 529 U.S. at 409, 120 S.Ct. at 1521.

15   Although the Supreme Court has not provided a specific definition of "objectively unreasonable,"

16   it has made clear that an unreasonable application of federal law is different from an incorrect

17   application of federal law, explaining that "[u]nder § 2254(d)'s 'unreasonable application' clause,

18   a federal habeas court may not issue the writ simply because that court concludes in its

19   independent judgment that the state-court decision applied [a Supreme Court case] incorrectly."

20   Visciotti, 537 U.S. at 24-25, 123 S.Ct. at 360; accord Rice v. Collins, 546 U.S. 333, 342, 126 S.Ct.

21   969, 976 (2006); Williams, 529 U.S. at 411, 120 S.Ct. at 1522; Andrade, 538 U.S. at 75-76, 123

22   S.Ct. at 1175; Edwards v. Lamarque, 475 F.3d 1121, 1125 (9th Cir.) (en banc), cert. denied, 552

23   U.S. 1009, 128 S.Ct. 532 (2007).  "The 'unreasonable application' clause requires the state court

24   decision to be more than incorrect or erroneous." Andrade, 538 U.S. at 75, 123 S.Ct. at 1174.

25   "Only if the evidence is 'too powerful to conclude anything but' the contrary should [the habeas

26   court] grant relief." Edwards, 475 F.3d at 1126 (quoting Miller-El v. Dretke (Miller-El 2), 545 U.S.

27   231, 265, 125 S.Ct. 2317, 2339 (2005)).

28

Under § 2254(d)(2), "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell (Miller-El 1), 537 U.S. 332, 340, 123 S.Ct. 1029, 1041 (2003). "[W]hether petitioner's conviction 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' . . . is a daunting standard[.]" Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir.), cert. denied, 543 U.S. 1038, 125 S.Ct. 809 (2004). However, it "is not impossible to meet[.]" Id.; see also Miller-El 1, 537 U.S. at 340, 123 S.Ct. at 1041 ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

The analysis under § 2254(d)(2) begins with an intrinsic review of the state court's processes, which "must be particularly deferential[.]" Taylor, 366 F.3d at 999-1000. "For example, in concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that [a federal court of appeal] would reverse in similar circumstances if this were an appeal from a district court decision. Rather, [the federal habeas court] must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." Id. at 1000. Similarly, before concluding that a state court's fact-finding process is materially deficient, a federal habeas court "must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Id.

Section 2254(d)(2) intrinsic challenges to state-court factual findings occur under several discrete situations. First, "the state court should have made a finding of fact but neglected to do so." Taylor, 366 F.3d at 1000. Second, "the state court does make factual findings, but does so under a misapprehension as to the correct legal standard." Id. at 1001. Third, the state court's "fact-finding process itself is defective." Id. Finally, the state court "plainly misapprehend[s] or misstate[s] the record in making its findings, and the misapprehension goes to a material factual

1    issue that is central to petitioner's claim[.]"  Id.; see also Sarausad v. Porter, 479 F.3d 671, 699

2    (9th Cir.), vacated in part, 503 F.3d 822 (9th Cir. 2007), and rev'd on other grounds,129 S.Ct. 823

3    (2009) (a § 2254(d)(2) error occurs where the state court misapprehends the record or draws

4    factual conclusions unsupported by substantial evidence).

5           If the state court's fact-finding process survives this intrinsic review, "the state court's

6    findings are dressed in a presumption of correctness, which then helps steel them against any

7    challenge based on extrinsic evidence, i.e., evidence presented for the first time in federal court."

8    Taylor, 366 F.3d at 1000 (italics in original); see Kesser v. Cambra, 465 F.3d 351, 358 n. 1 (9th

9    Cir. 2006) (en banc) (clear and convincing proof required to rebut state court findings of fact with

10   extrinsic evidence presented for the first time in the federal habeas court).  The habeas petitioner

11   presenting evidence for the first time in federal court can overcome the presumption that the state

12   court's findings are correct only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1) ("In

13   a proceeding instituted by an application for a writ of habeas corpus by a person in custody

14   pursuant to the judgment of a State court, a determination of a factual issue made by a State court

15   shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption

16   of correctness by clear and convincing evidence.").

17   II.    BATSON CHALLENGE.

18          Petitioner, who is Latino, asserts that his Sixth Amendment right to a fair and impartial jury

19   was violated by the prosecutor's discriminatory use of his peremptory challenges.  (See Petition

20   at 6).  Petitioner argues that the prosecutor's reasons for striking certain women venire members

21   were pretextual and constituted purposeful discrimination in violation of the Equal Protection

22   Clause.  (See Memo at 9-12).

23          A.    Relevant Background.

24          During jury selection, two of the prosecutor's first four peremptory challenges were made

25   against black women jurors (Juror Nos. 7947 and 1512).  (See Reporter's Transcript ("RT") at 317,

26

27

28

1  430, 448, 455, 472 & 495).  Thereafter, petitioner's counsel made a contemporaneous Wheeler

2  motion.[6]  (See id. at 495).  Defense counsel argued

> that [the prosecutor] has dismissed two potential jurors, two of them being
>
> black.  [¶]  And in the case of [Juror No. 1512], she had nothing that was one
>
> way or the other.  [¶]  She didn't know anybody who . . . was arrested in her
>
> family.  [¶]  The only thing that I got down there was that she was a black
>
> woman.  [¶]  I don't see any reason for her to be excused and I think a
>
> pattern is beginning to develop.  [¶]  We only have four or five other people
>
> up there who are black.  [¶]  I think that is where [the prosecutor] is going.

10  (Id. at 495-96).  The trial court denied the motion, agreeing with the prosecutor that petitioner had

11  not established a prima facie case of bias.  (See id. at 496).

12      Later, the prosecutor used two of his next five peremptory challenges against a Latino

13  woman and another black woman (Juror Nos. 8731 and 1508).  (See RT at 502, 508, 513, 518,

14  534, 538 & 543).  Thereafter, petitioner's counsel made a second Batson motion:

> [Juror No. 8731] was a female Hispanic.  Long Beach.  Grocery clerk.
>
> Getting married in two years.  [¶]  She had no prior experience.  [¶]  I don't
>
> know what it was about her that the district attorney didn't like.  [¶]  She was
>
> the one that knew a couple of sheriffs, but was Hispanic.
>
> Now we have [the prosecutor] kicking [Juror No. 1508] who was a
>
> black female, make up artist.  Single.  [¶]  Her ex-husband was in the military
>
> that she was not too happy with being married to.  [¶]  She had no prior.  [¶]
>
> We are losing, as far as the district attorney is concerned, all of our minority
>
> women.

_____

[6] People v. Wheeler, 22 Cal.3d 258 (1978).  Under California law, race-based peremptory challenges are attacked by way of a Wheeler motion.  See Tolbert v. Gomez, 190 F.3d 985, 987 (9th Cir. 1999).  Because a Wheeler motion serves as an implicit Batson objection, the court will refer to petitioner's objection as a Batson challenge.  See Boyd v. Newland, 467 F.3d 1139, 1142 n. 2 (9th Cir. 2006, as amended June 26, 2006, and as amended Oct. 26, 2006), cert. denied, 550 U.S. 933, 127 S.Ct. 2249 (2007).

1  (Id. at 543-44).

2      The prosecutor sought clarification from the defense attorney as to the cognizable class

3  being raised:

4          I'm not sure what I am defending against. [¶]  It is a very generalized

5          class.    [¶]   I guess they are young.    [¶]   What is your thought on

6          systematically excluding?

7  (RT at 545).  Defense counsel stated that the class was "[m]inority women[,]" and summarized his

8  Batson motion:

9          We have had another one that we complained about previously and

10         we did not say anything about the first black female that you kicked.

11         So now in the scheme of things, out of nine jurors that [the prosecutor

12         has] kicked, we have approximately five that were female and were

13         minority[.] . . . But the bottom line is that there was nothing about the

14         background of either of these people to justify kicking other than their race.

15  (Id.).

16     In response, the prosecutor stated that he was

17         not sure what general class of minority women is that class, but in regard to

18         the kicks, I think looking at the racial make up of the veneer as a whole and

19         looking at the number of kicks, there were two African American women

20         brought up the last time we were up here.  [¶]  I have kicked one more

21         African American woman. [¶]  There are three more African Americans in the

22         box.[7] . . . I don't think there is a prima facie case.

23

24  ─────────────────

25      [7] The trial court accepted the prosecutor's contention that the venire included six black jurors.  (See RT at 546).  While petitioner suggests that the venire included only five black jurors,

26  (see Evidentiary Hearing Exh. 9), he has not provided clear and convincing evidence that the state court's finding was in error.  See 28 U.S.C. § 2254(e)(1) (state court factual finding may be

27  overturned only if new evidence presented for the first time in federal court amounts to clear and convincing evidence that the state-court finding is in error).  Thus, the following discussion will

28  assume that the venire included six black jurors.

1    (RT at 545-46).  The trial court again found that petitioner failed to make a prima facie showing

2    of discrimination and therefore did not require the prosecutor to explain why he removed the jurors

3    referenced above.  (See id. at 546).

4         B.    The Court Of Appeal's Opinion.

5    The California Court of Appeal stated as follows with respect to petitioner's Batson claim:

6              During  jury  selection,  the  prosecution  used  four  peremptory

7         challenges, the first and last of which were of Black women. [Petitioner] then

8         made  a  Wheeler  motion,  arguing  the  prosecutor  was  dismissing  Black

9         women jurors who were otherwise unobjectionable. The trial court denied the

10        motion, finding [petitioner and Pagan] had failed to make a sufficient prima

11        facie showing.

12             Later, the prosecutor used his eighth peremptory challenge to excuse

13        a Hispanic woman, and his ninth such challenge to excuse another Black

14        woman. Pagan then made a second Wheeler motion. [Petitioner and Pagan]

15        noted that the prosecutor used four of his nine peremptories on minority

16        women whom the defense argued were otherwise as unobjectionable as

17        other jurors. None of the excused jurors to whom [petitioner and Pagan]

18        objected  to  being  challenged  had  prior  jury  experience.  The  excused

19        Hispanic woman was a grocery clerk engaged to a fellow employee, and

20        knew some sheriff's deputies. One of the challenged Black women was a

21        divorced makeup artist whose aunt was convicted of drunken driving where

22        the victim was killed, and the prospective juror had attended some of the

23        court proceedings. The second excused Black woman was a single mother

24        employed as an office assistant by a school district. The third excused Black

25        woman was a single mother working in health care. The father of one of her

26        children had been convicted of selling drugs and went to state prison. A close

27        friend was convicted of carjacking and the juror had attended some related

28        court hearings.

1   The prosecutor objected that minority women were not a cognizable
2   class, but stated three Black prospective jurors remained in the jury box. The
3   prosecutor also noted each of the challenged jurors was young.

4   The trial court again found no sufficient prima facie showing had been
5   made and denied the motion. Jury selection continued. The prosecutor
6   eventually used eleven such challenges, three against Black women and one
7   against a Hispanic woman. Thus, none of the prosecutor's other seven
8   peremptory challenges were against minority women. As noted, the
9   prosecutor accepted the panel at a time when it contained three Black
10  women.

11  [Petitioner and Pagan] contend the trial court erred in twice finding
12  they failed to make a prima facie showing that the prosecutor was excluding
13  Black or minority women on the basis of group identity. The contention lacks
14  merit.

15  "If a party believes his opponent is using his peremptory challenges
16  to strike jurors on the ground of group bias alone, he must  raise the point in
17  a timely fashion and make a prima facie case of such discrimination to the
18  satisfaction of the court. First, as in the case at bar, he should make as
19  complete a record of the circumstances as is feasible. Second, he must
20  establish that the persons excluded are members of a cognizable group
21  within the meaning of the representative cross-section rule. Third, from all the
22  circumstances of the case he must show a strong likelihood that such
23  persons are being challenged because of their group association rather than
24  because of any specific bias.

25  "We shall not attempt a compendium of all the ways in which a party
26  may seek to make such a showing. For illustration, however, we mention
27  certain types of evidence that will be relevant for this purpose. Thus the party
28  may show that his opponent has struck most or all of the members of the

14

1    identified group from the venire, or has used a disproportionate number of his

2    peremptories against the group. He may also demonstrate that the jurors in

3    question share only this one characteristic – their membership in the group –

4    and that in all other respects they are as heterogeneous as the community

5    as a whole. Next, the showing may be supplemented when appropriate by

6    such circumstances as the failure of his opponent to engage these same

7    jurors in more than desultory voir dire, or indeed to ask them any questions

8    at all. Lastly . . . the defendant need not be a member of the excluded group

9    in order to complain of a violation of the representative crosssection rule; yet

10   if he is, and especially if in addition his alleged victim is a member of the

11   group to which the majority of the remaining jurors belong, these facts may

12   also be called to the court's attention.

13        "Upon presentation of this and similar evidence – in the absence, of

14   course, of the jury – the court must determine whether a reasonable

15   inference arises that peremptory challenges are being used on the ground

16   of group bias alone. We recognize that such a ruling 'requires trial judges to

17   make difficult and often close judgments. They are in a good position to make

18   such determinations, however, on the basis of their knowledge of local

19   conditions and of local prosecutors.' [Citation.] They are also well situated to

20   bring to bear on this question their powers of observation, their

21   understanding of trial techniques, and their broad judicial experience. We are

22   confident of their ability to distinguish a true case of group discrimination by

23   peremptory challenges from a spurious claim interposed simply for purposes

24   of harassment or delay.

25        "If the court finds that a prima facie case has been made, the burden

26   shifts to the other party to show if he can that the peremptory challenges in

27   question were not predicated on group bias alone. . . .

28

15

"If the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted. Accordingly, the court must then . . . dismiss the jurors thus far selected. So too it must quash any remaining venire. . . . Upon such dismissal a different venire shall be drawn and the jury selection process may begin anew." (*People v. Wheeler*, *supra*, 22 Cal.3d at pp. 280-282, fns. omitted; *Batson v. Kentucky* (1986) 476 U.S. 79, 93-98; *People v. Turner* (1994) 8 Cal.4th 137, 164-165.)

"An appellate court reviews a trial court's ruling on a motion under *Wheeler* and/or *Batson* for substantial evidence. [Citations.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 196.) *Wheeler* error is reversible per se regardless of prejudice. (*People v. Wheeler*, *supra*, 22 Cal.3d at p. 283.) A *Wheeler* motion impliedly raises the federal constitutional claim under *Batson*. (*People v. Alvarez*, *supra*, 14 Cal.4th at p. 195.) Thus, we reject the Attorney General's argument that [petitioner and Pagan] waived any federal constitutional challenge by failing to expressly name *Batson* as well as *Wheeler* in support of their motion.

"'[W]hen a trial court denies a *Wheeler* motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire. As with other findings of fact, we examine the record for evidence to support the trial court's ruling. Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal. If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm.'" (*People v. Mayfield* (1997) 14 Cal.4th 668, 723, citations omitted.)

Earlier, focusing on slightly different language in *Wheeler* and *Batson*, cases disputed whether the party making a *Wheeler/Batson* challenge first had to make its prima facie showing of group bias by a strong likelihood or

a reasonable inference. Recently, our Supreme Court clarified that "in California, a 'strong likelihood' means a 'reasonable inference.'" *(People v. Box* (2000) 23 Cal.4th 1153, 1188, fn. 7.)

"[T]he only bases for establishing a prima facie case cited by defense counsel were that all of the challenged prospective jurors were Black and either had indicated that they could be fair and impartial or in fact favored the prosecution. This is insufficient. [Citations.]" (*People v. Turner*, *supra*, 8 Cal.4th at p. 167.) "Of course, a trial court should not 'blind itself to everything except defense counsel's presentation.' [Citation.] Here, the trial judge, who had observed the voir dire, was in the best position to determine under 'all the relevant circumstances' of the case whether there was a "'strong likelihood'" these prospective jurors were being challenged 'because of their group association.' [Citations.] . . . [T]he record clearly established specific nonrace-related reasons why a prosecutor might want to excuse the challenged prospective jurors. [Citations.] Moreover . . . both sides had excused Black jurors and the prosecutor had accepted a jury that included, as did the jury ultimately impaneled, five Blacks. While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection. [Citations.]" (*Id.* at p. 168. [affirming trial court's finding of no prima facie showing by defense].)

"[T]he only bases for establishing a prima facie case cited by defense counsel were that (1) [petitioner and Pagan] were African-American, (2) both of the women were African-American and (3) nothing in their questionnaires or responses to oral questions would indicate a particular reason why they would not be suitable jurors. *That was the sum total of the defense presentation.* But this quantum of showing has consistently been held to be

1    insufficient in demonstrating a strong likelihood that the prospective jurors

2    were being challenged on the basis of their group association. [Citations.]"

3    (*People v. Buckley* (1997) 53 Cal.App.4th 658, 665 [affirming trial court's

4    finding of no prima facie case].)

5         Courts consistently have declined to address whether members of

6    different cognizable groups may be lumped together to constitute a single

7    class under *Wheeler*. (*People v. McGhee* (1987) 193 Cal.App.3d 1333, 1353;

8    *People v. Charron* (1987) 193 Cal.App.3d 981, 987.)

9         Two of the challenged Black women had close relatives and friends

10   who were convicted of serious crimes during court proceedings attended by

11   the challenged jurors. Their attendance at such hearings could reasonably

12   be construed as demonstrating support for their convicted friends and

13   relatives. Such challenges by a prosecutor are demonstrably reasonable. All

14   the challenged jurors were young, a characteristic itself justifying excusal.

15   The other two jurors also lacked jury experience and worked at relatively

16   low-level jobs. All those factors would support exclusion. The prosecutor

17   accepted the panel with three Black women members. In the absence of

18   other facts demonstrating racial bias, sufficient evidence supports the trial

19   court's findings that [petitioner and Pagan] failed to demonstrate sufficient

20   prima facie showings.

21   (Opinion at 117-22).

22        C.    Applicable Federal Law.

23   Under clearly-established federal law, "the Equal Protection Clause forbids the prosecutor

24   to challenge potential jurors solely on account of their race or on the assumption that black jurors

25   as a group will be unable impartially to consider the State's case against a black defendant."

26

27

28

1    Batson v. Kentucky, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719 (1986).[8]  The Supreme Court has

2    articulated a three-part test to govern the analysis of Batson claims:

3                    First, the defendant must make out a prima facie case by showing that the

4                    totality of the relevant facts gives rise to an inference of discriminatory

5                    purpose.  Second, once the defendant has made out a prima facie case, the

6                    burden shifts to the State to explain adequately the racial exclusion by

7                    offering permissible race-neutral justifications for the strikes.  Third, if a

8                    race-neutral explanation is tendered, the trial court must then decide whether

9                    the opponent of the strike has proved purposeful racial discrimination.

10   Johnson v. California, 545 U.S. 162, 168, 125 S.Ct. 2410, 2416 (2005) (internal quotation marks,

11   alterations, citations and footnote omitted).  "[T]he ultimate burden of persuasion regarding racial

12   motivation rests with, and never shifts from, the opponent of the strike."  Purkett v. Elem, 514 U.S.

13   765, 768, 115 S.Ct. 1769, 1771 (1995) (per curiam).

14        D.    Step One – The Prima Facie Case.[9]

15        This court "would normally be required to defer to the court of appeal's factual finding that

16   there was no prima facie showing of bias."  Paulino v. Castro (Paulino I), 371 F.3d 1083, 1090 (9th

17   Cir. 2004).  However, in making its finding that petitioner failed to establish a prima facie showing

18   of racial bias, (see Opinion at 122), the court of appeal required petitioner to demonstrate "a strong

19   likelihood" of bias under Wheeler.  (See id. at 119).  But "the Wheeler 'strong likelihood' test for

20   a successful prima facie showing of bias is impermissibly stringent in comparison to the more

21   generous Batson 'inference' test."  Wade v. Terhune, 202 F.3d 1190, 1197 (9th Cir. 2000) (italics

22

23        [8] The Batson Court limited its holding to situations in which the defendant and the excluded
24   prospective jurors were members of the same cognizable group.  476 U.S. at 96, 106 S.Ct. at
     1723.  In Powers v. Ohio, 499 U.S. 400, 402, 111 S.Ct. 1364, 1366 (1991), the Supreme Court
25   eliminated that limitation and, in J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 129, 114 S.Ct. 1419,
     1421 (1994), the Court ruled that "gender, like race, is an unconstitutional proxy for juror
26   competence and impartiality."

27        [9] Because the court concludes that petitioner has demonstrated a Batson violation with
     respect to two of the black jurors, see infra at §§ II.F.2.-3., the court need not evaluate the validity
28   of the prosecutor's peremptory challenges with respect to the Latino jurors.  See infra at § II.G.

1   in original).  As such, "California courts in following the 'strong likelihood' language of *Wheeler* are

2   not applying the correct legal standard for a *prima facie* case under *Batson*."  Id. (italics in original);

3   see Johnson, 545 U.S. at 173, 125 S.Ct. at 2419 ("California's 'more likely than not' standard is

4   at odds with the prima facie inquiry mandated by *Batson*.") (italics in original).  Thus, because "the

5   state court used the 'strong likelihood' standard for reviewing [petitioner's] *Batson* claim, the state

6   court's findings are not entitled to [AEDPA] deference and [this court's] review is de novo."[10]

7   Williams v. Runnels, 432 F.3d 1102, 1105 (9th Cir. 2006) (applying de novo review to petitioner

8   who was tried in March 1998); (see also Resp's Memo at 10) (respondent conceding that

9   "[b]ecause the California Court of Appeal equated the 'strong likelihood' standard with the federal

10  standard, this Court conducts a de novo review[]").

11          The first step of the Batson test – the prima facie case – has three elements.  Petitioner

12  "must show that (1) the prospective juror is a member of a 'cognizable racial group,' (2) the

13

14          [10] This de novo review also applies to steps two and three of the Batson analysis.  See
15  Paulino v. Harrison (Paulino II), 542 F.3d 692, 698 (9th Cir. 2008) (stating, in reviewing steps two
    and three de novo, that the state court's "application of the incorrect legal standard for evaluating
16  the prima facie case of discrimination takes this claim outside of the AEDPA frame-work and
    requires us to review it de novo.").  In other words, the state court's use of the wrong legal
17  standard at step one requires the court to conduct a de novo review of steps two and three.  See
    id.; Frantz v. Hazey, 533 F.3d 724, 734 (9th Cir. 2008) (en banc) ("[M]istakes in reasoning or in
18  predicate decisions of the type in question here – use of the wrong legal rule or framework – do
    constitute error under the 'contrary to' prong of § 2254(d)(1)."); see also id. Frantz, 533 F.3d at 739
19  ("To identify a § 2254(d)(1) 'contrary to' error, we analyze the court's actual reasoning, to the
    extent that the Supreme Court has dictated how a state court's reasoning should proceed.
20  Identification of such an error is not the end of a federal habeas court's analysis, however, unless
    that identification necessarily means that the state court's determination of the ultimate
21  constitutional or legal question is also wrong.  Instead, pursuant to § 2254(a) and pre-AEDPA
    standards of review, we must also evaluate de novo the petitioner's constitutional claims, without
22  limiting ourselves to the reasoning of the state court.").  Further, because the state court
    determined that petitioner had not established a prima facie case, it never required the prosecutor
23  to provide his actual reasons for his strikes and the court never made any findings with respect
24  to steps two and three, i.e., there are no state court findings to presume correct on habeas review.
    See Paulino II, 542 F.3d at 698 n. 5 ("because no state court ever reached the issue before us,
25  we are not bound by AEDPA's strictures[]"); see also Green v. LaMarque, 532 F.3d 1028, 1031
26  (9th Cir. 2008, as amended Aug. 4, 2008) (A federal habeas court "must conduct [the comparative
    juror] analysis de novo, rather than remanding for the state courts to do so.") (italics in original);
27  Kesser, 465 F.3d at 361 ("[I]n Miller-El [2], the Court made clear that the comparative analysis is
28  required even when it was not requested or attempted in the state court.") (italics in original).

1   prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances

2   raises an inference that the strike was motivated by race." Boyd v. Newland, 467 F.3d 1139, 1143

3   (9th Cir. 2006, as amended June 26, 2006, and as amended Oct. 26, 2006), cert. denied, 550 U.S.

4   933, 127 S.Ct. 2249 (2007) (citing Batson, 476 U.S. at 96, 106 S.Ct. at 1723). "[A] defendant

5   satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial

6   judge to draw an inference that discrimination has occurred." Johnson, 545 U.S. at 170, 125 S.Ct.

7   at 2417 (italics in original).  To establish an inference,

8               the defendant first must show that he is a member of a cognizable racial

9               group and that the prosecutor has exercised peremptory challenges to

10              remove from the venire members of the defendant's race.  Second, the

11              defendant is entitled to rely on the fact, as to which there can be no dispute,

12              that peremptory challenges constitute a jury selection practice that permits

13              those to discriminate who are of a mind to discriminate.  Finally, the

14              defendant must show that these facts and any other relevant circumstances

15              raise an inference that the prosecutor used that practice to exclude the

16              veniremen from the petit jury on account of their race.

17  Batson, 476 U.S. at 96, 106 S.Ct. at 1723 (internal quotation marks and citations omitted).

18      Respondent asserts that petitioner has failed to establish a prima facie showing of racial

19  bias because the group that petitioner alleges the prosecutor removed – "minority women" – is not

20  cognizable under Batson. (Resp's Memo at 13-14); (see also id. at 5-8) (respondent arguing that

21  a finding that minority women constitutes a cognizable class for Batson purposes would violate

22  Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060 (1989)).  Respondent's assertion is persuasive.

23      Petitioner has not identified, and the court cannot locate, any Supreme Court authority that

24  extends or otherwise applies Batson to combined race-gender groups.[11] (See, generally, Petr's

25

26      [11] Under California law, black and Latino women each constitute cognizable groups for
    Wheeler purposes.  See People v. Motton, 39 Cal.3d 596, 606 (1985) (treating black women as
27  a cognizable group); People v. Garceau, 6 Cal.4th 140, 171 (1993), cert. denied, 513 U.S. 848,
    115 S.Ct. 144 (1994), and overruled on other grounds, People v. Yeoman, 31 Cal.4th 93 (2003)
28  (assuming that Latino women constitute a cognizable group under Wheeler).

Memo at 6-9; Supp. Reply at 3-7).  "[N]either the Supreme Court nor the Ninth Circuit has recognized that the combination of race and gender . . . may establish a cognizable group for *Batson* purposes."  Turner v. Marshall (Turner I), 63 F.3d 807, 812 (9th Cir. 1995) (italics in original), cert. denied, 552 U.S. 1153, 118 S.Ct. 1178, and overruled on other grounds, Tolbert v. Page, 182 F.3d 677, 681 (9th Cir. 1999); see United States v. Walker, 490 F.3d 1282, 1291 n. 10 (11th Cir. 2007), cert. denied,  552 U.S. 1257, 128 S.Ct. 1649 (2008) ("The Supreme Court has not yet ruled whether constitutional protections afforded to race-based groups in *Batson*, and gender-based groups in *J.E.B. v. Alabama ex rel. T.B.*, extend to combined race-gender groups.") (italics in original).  "Although the issue of whether [black or Latino women] could constitute a *Batson* class likely is worthy of consideration in light of [Supreme Court and Ninth Circuit] holdings that gender as well as race is an impermissible basis for peremptory challenges, [the court] decline[s] to consider this issue because any new rule defining what constitutes a 'cognizable group' could not be applied to [petitioner]'s case."  Turner I, 63 F.3d at 812 (italics in original) (internal citations omitted).  Thus, the court will limit its inquiry to whether petitioner has made a prima facie showing of impermissible exclusion of black jurors as a class, with no reference to gender.[12]  See id.; (see also Petr's Memo at 11; Supp. Reply at 6).

The first two elements of the prima facie case do not appear to be in dispute: the prospective jurors (Juror Nos. 1508 and 1512) are members of a cognizable racial group and the prosecutor used peremptory strikes to remove them.  See Boyd, 467 F.3d at 1143.  The critical

_____

[12]  Respondent contends that "Petitioner never calculated the percentage of African Americans, without reference to gender, that were struck by the prosecutor and has offered no comparison of that percentage with the percentage of African Americans remaining on the final jury panel."  (Resp's Memo at 15).  However, contrary to respondent's contention, petitioner did calculate the percentage of black jurors without reference to gender.  (See Petr's Memo at 11) (noting that "the prosecution struck sixty percent of all African-American jurors"); (Supp. Reply at 6) ("the prosecutor's exclusion of 60% of the African-American jurors is clearly sufficient to establish a prima-facie case of racial discrimination[]").  Even assuming petitioner had not identified black jurors as a cognizable group for Batson purposes, the court would not be prohibited from evaluating petitioner's claim.  See Turner I, 63 F.3d at 812 (declining to consider black males as a cognizable group but considering sua sponte whether petitioner "has made a prima facie case of impermissible exclusion of African-American jurors as a class, with no reference to gender[]").

1    issue, therefore, is whether petitioner has produced "evidence sufficient to . . . draw an inference
2    that discrimination has occurred." Johnson, 545 U.S. at 170, 125 S.Ct. at 2417.  This standard
3    is a less burdensome standard of proof than the preponderance ("more likely than not") standard.
4    See id. at 168, 125 S.Ct. at 2416.  "[T]he burden for making a prima facie case is not an onerous
5    one." Boyd, 467 F.3d at 1151; Paulino I, 371 F.3d at 1092 ("Batson's inference standard was
6    intended significantly to reduce the quantum of proof previously required of a defendant who
7    wished to raise a claim of racial bias in the jury selection procedure[.]").  "A single inference of
8    discrimination based on all the relevant circumstances and the totality of relevant facts is sufficient
9    to move the Batson inquiry to step two." United States v. Collins, 551 F.3d 914, 920 (9th Cir.
10   2009) (citing Batson, 476 U.S. at 94 & 96, 106 S.Ct. at 1721 & 1723) (internal quotation marks and
11   brackets omitted) (italics in original).

12        Under the circumstances, the court is persuaded that petitioner has identified facts that
13   raise an inference of discrimination.  First, both petitioner (Latino) and the stricken jurors (black)
14   are members of cognizable racial groups. (See 2 ERT at 75-76) (parties stipulating that petitioner
15   is Latino); Fernandez v. Roe, 286 F.3d 1073, 1077 (9th Cir.), cert. denied, 537 U.S. 1000, 123
16   S.Ct. 514 (2002) ("Both Hispanics and African-Americans constitute 'cognizable groups' for Batson
17   purposes.") (italics in original); see also Paulino I, 371 F.3d at 1090 n. 6 ("The defendant and the
18   stricken jurors need not be members of the same racial group."); accord Tolbert, 182 F.3d at 680
19   n. 4 (The Supreme Court has "liberalized Batson and abolished the requirement that the defendant
20   and the stricken juror share the same race.") (italics in original) (discussing Powers, 499 U.S. at
21   402, 111 S.Ct. at 1366).

22        Second, two different statistics – the percentage of available black jurors challenged and
23   the percentage of peremptory challenges used against blacks – provide support for an inference
24   of discrimination.  See Turner I, 63 F.3d at 813.  At the time of petitioner's second Batson motion,
25   the prosecutor had struck three out of six possible black jurors.[13] (See RT at 543-46).  Also, while

_____

27        [13] The court focuses its analysis on the second Batson motion because of the larger sample
28   size. Cf. Fernandez, 286 F.3d at 1078 (noting that small sample sizes are potentially unreliable);
     Wade, 202 F.3d at 1198 ("the sample is so small that the statistical significance of the percentages

1    blacks accounted for only 11% of the venire, (see Evidentiary Hearing Exh. 9), the prosecutor

2    used 33% of his challenges against black jurors.  (See RT at 545); see also Turner I, 63 F.3d at

3    813 ("Not only did the prosecution strike a significant proportion of the available African-American

4    venirepersons, but it also used a significant percentage of its peremptory challenges against

5    African-Americans.").   These bare facts present a statistical disparity that, on their own, are

6    sufficient to make out a prima facie showing of bias at step one.  See Williams, 432 F.3d at 1107

7    ("We have held that a defendant can make a prima facie showing based on a statistical disparity

8    alone."); Paulino I, 371 F.3d at 1091 ("[A] defendant can make a prima facie showing based on

9    statistical disparities alone."); see, e.g., United States v. Lorenzo, 995 F.2d 1448, 1453-54 (9th

10   Cir.), cert. denied, 510 U.S. 881, 114 S.Ct. 225 (1993) (finding inference of discrimination where

11   three of nine Hawaiian jurors stricken); United States v. Bishop, 959 F.2d 820, 822 (9th Cir. 1992),

12   overruled on other grounds, Purkett, 514 U.S. at 768, 115 S.Ct. at 1771, and United States v.

13   Nevils, 598 F.3d 1158, 1167 (9th Cir. 2010) (finding inference of discrimination where two of four

14   black jurors stricken); Fernandez, 286 F.3d at 1078 (finding inference of discrimination where

15   prosecutor used 21% of strikes against Latino jurors, who constituted only 12% of the venire);

16   Turner I, 63 F.3d at 813 (finding inference of discrimination where prosecutor used 56% of strikes

17   against black jurors, who constituted only 30% of venire); Williams, 432 F.3d at 1107 (finding

18   inference of discrimination where prosecutor used 75% of strikes against black jurors, who

19   constituted only 8% of the venire).

20        Although statistical disparities can be sufficient to establish a prima facie case of bias, the

21   presumption can be dispelled by other relevant circumstances.  See Williams, 432 F.3d at 1107

22   ("[A]lthough a statistical disparity [can] be sufficient to make a prima facie inference of bias, such

23   a presumption [can] be dispelled by other relevant circumstances. . . .  It follows that, when

24   _____

25   is limited[]").  Further, even if the prima facie case is evaluated at the end of voir dire, the statistical
     disparities are still significant.  See Paulino I, 371 F.3d at 1091 ("We sometimes consider whether

26   the [temporal] context in which a defendant made a Batson objection changes the significance of
     a statistical pattern in the exercise of peremptory challenges.") (italics in original).  By the end of

27   the voir dire (not including the alternates), the prosecutor had struck 50% of blacks in the venire
     and used 27% of his strikes against black jurors, who constituted only 11% of the venire.  (See

28   Evidentiary Hearing Exh. 9).

reviewing a *Batson* claim, a court should continue to consider any other relevant circumstances brought to their attention that may support or refute an inference of discriminatory purpose.") (internal quotation marks and citation omitted) (italics in original). "[T]o rebut an inference of discriminatory purpose based on statistical disparity, the 'other relevant circumstances' must do more than indicate that the record would support race-neutral reasons for the questioned challenges." Id. at 1108. Here, other than seeking a clarification as to the cognizable class and opining that petitioner failed to make a prima facie Batson claim, the prosecutor did not provide any contemporaneous explanations for his peremptory challenges. (See RT at 496 & 545-46). Because the trial court never required the prosecutor to give his actual reasons for striking the subject jurors, the court "cannot determine the reasonableness of the prosecutor's challenges[.]" Williams, 432 F.3d at 1108. The court "can only review the record to determine whether 'other relevant circumstances' eroded the premises of [petitioner's] allegations of discrimination based on statistical disparity." Id.

Respondent contends that petitioner has not made a prima facie showing of discriminatory bias because the final panel contained three black and two Latino jurors, which the prosecutor accepted even though he still had nine challenges remaining. (See Resp's Memo at 15-16). Although these facts are helpful, they are not dispositive. See Fernandez, 286 F.3d at 1079 ("That one Hispanic juror remained on the jury, though helpful to the State, is not dispositive."); Turner I, 63 F.3d at 814 ("In denying a *Batson* motion, . . . a trial court may not rely solely on the fact that some African-Americans remain on the jury.") (italics in original). "The discrimination condemned by *Batson* need not be as extensive as numerically possible." United States v. Alvarado, 923 F.2d 253, 256 (2d Cir. 1991); Turner I, 63 F.3d at 811-14 (finding a prima facie case of discrimination despite the fact that four blacks sat on the jury). This is because, regardless of the racial diversity of the sworn jury, striking even a single juror for discriminatory purposes constitutes a Batson violation. See Williams, 432 F.3d at 1107 (The "Constitution forbids striking even a single prospective juror for a discriminatory purpose.") (internal quotation marks and citation omitted); Turner I, 63 F.3d at 814 ("Regardless of the final racial makeup of the jury, the exclusion of a single minority juror on account of race would constitute a *Batson* violation.") (italics in original).

1      In any event, among the other relevant circumstances to consider is that, in addition to

2  striking three black jurors, the prosecutor struck two Latino jurors – Juror Nos. 8727 and 8731.

3  (See RT at 306-07, 513, 534, 538, 543-46, 563 & 615; Evidentiary Hearing Exhs. 7 & 9). "Striking

4  members of more than one protected group is also relevant and may indicate a discriminatory

5  intent." Collins, 551 F.3d at 921.  The strikes against both black and Latino jurors (collectively,

6  "minority jurors") – irrespective of gender – reveals a statistical disparity.  At the time of petitioner's

7  second Batson motion, five out of the nine peremptories, or 55%, used by the prosecutor were

8  against minority jurors.  (See RT at 306-07, 513, 538 & 543-46).  In total, the prosecutor exercised

9  five out of eleven, or 45%, of his peremptory challenges to remove minority jurors.  (See

10  Evidentiary Hearing Exh. 9); Alvarado, 923 at 255-56 (finding a prima facie case because the

11  prosecution challenged 50% of minority venirepersons – Latinos and blacks – who represented

12  only 29% of the population of the Eastern District of New York); Fernandez, 286 F.3d at 1079

13  (finding "a bare record of statistical disparities of peremptory strikes against Hispanic and

14  African-American venirepersons[]").

15      Further, the record developed in this court supports – rather than dispels – an inference of

16  bias.  For example, the prosecutor's failure to satisfy his burden at step two provides additional

17  support to the inference of discrimination raised by the prima facie case.  See infra at § II.E.; see

18  also Johnson, 545 U.S. at 171 n. 6; 125 S.Ct. at 2417 n. 6 (stating that a prosecutor's refusal to

19  offer a reason at step two "would provide additional support for the inference of discrimination

20  raised by a defendant's prima facie case[]"); Yee v. Duncan, 463 F.3d 893, 899 (9th Cir. 2006),

21  cert. denied, 552 U.S. 1043, 128 S.Ct. 653 (2007) (a prosecutor's "failure to satisfy []his burden

22  [at step two] to produce [and explain the reason for his strike] – for whatever reason – becomes

23  evidence that is added to the inference of discrimination raised by the prima facie showing").

24  Similarly, the comparative juror analysis performed by the court, see infra at §§ II.F.2.-3., provides

25  further support that an inference of discrimination exists in this case.  See Collins, 551 F.3d at 921-

26  22 (applying comparative juror analysis to step one prima facie determination).

27      "[A]lthough the striking of one or two members of the same racial group may not always

28  constitute a prima facie case, it is preferable for the court to err on the side of the defendant's

1  rights to a fair and impartial jury."  United States v. Chinchilla, 874 F.2d 695, 698 n. 5 (9th Cir.

2  1989).  Batson's "inference" standard "was intended significantly to reduce the quantum of proof

3  previously required of a defendant who wished to raise a claim of racial bias in the jury selection

4  procedure[,]" and thus "is not onerous."  Wade, 202 F.3d at 1197 (internal quotation marks and

5  citation omitted).

6        Here, petitioner, "having presented a statistical disparity based on the information then

7  known to him, cannot be charged, prior to the prosecutor's explanation of his challenges, with

8  developing a record that might refute the prosecutor's possible explanations."  Williams, 432 F.3d

9  at 1110.  Thus, the fact that there were minority jurors on petitioner's jury and that the prosecutor

10 did not use another peremptory challenge (despite having several left to use) to strike any

11 remaining black jurors is, on this record, insufficient to refute the inference of bias at step one.

12 See id. at 1109 ("It is true that the prosecutor accepted the jury, including African-American

13 members, several times before he exercised his first peremptory challenge.  This, however, does

14 not refute the inference that when the prosecutor did make peremptory challenges, he did so in

15 a purposefully discriminatory manner as evidenced by his use of three of his first four peremptory

16 challenges to dismiss African-American jurors.  Similarly, the fact that the prosecutor did not use

17 a peremptory challenge against an African-American juror after Williams' Wheeler objection is not

18 enough in this case to refute the inference.") (italics in original); Alvarado, 923 F.2d at 256 ("The

19 discrimination condemned by Batson need not be as extensive as numerically possible.").  Further,

20 as noted above, there are other relevant circumstances that support an inference of bias.  In short,

21 the court is persuaded, based on its de novo review of the existing record, see Williams, 432 F.3d

22 at 1110, that the totality of circumstances raises an inference of discrimination and, therefore, the

23 state court erred by not advancing to step two of the Batson inquiry.[14]

24 / / /

25 / / /

26 _____

27       [14] Thus, "because the state court used the wrong legal standard its factual determination
is not 'presumed to be correct,' or alternatively, [petitioner] has rebutted 'the presumption of
28 correctness.'"  Williams, 432 F.3d at 1110 n. 13 (citing 28 U.S.C. § 2254(e)(1)).

E.   Step Two – The Prosecutor's Explanations.

"*Batson*'s step two requires evidence of the prosecutor's *actual* reasons for exercising her peremptory challenges." Paulino v. Harrison (Paulino II), 542 F.3d 692, 699 (9th Cir. 2008) (italics in original).   "[T]he prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenge." Batson, 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20 (internal quotation marks and citation omitted).   As the Supreme Court has explained:

> The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.   The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question.

Johnson, 545 U.S. at 172, 125 S.Ct. at 2418 (italics in original) (internal citation omitted); see also Miller-El 2, 545 U.S. at 251-52, 125 S.Ct. at 2331-32 ("[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it.   It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is.   But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.") (emphasis added and internal citations omitted); Paulino I, 371 F.3d at 1090 ("[I]t does not matter that the prosecutor might have had good reasons to strike the prospective jurors.   What matters is the *real* reason they were stricken.") (italics in original).   "Evidence of a prosecutor's actual reasons may be direct or circumstantial, but mere speculation is insufficient." Paulino II, 542 F.3d at 700; Johnson, 545 U.S. at 172, 125 S.Ct. at 2418; Bui v. Haley, 321 F.3d 1304, 1314-18 (11th Cir. 2003) (stating that circumstantial evidence may be used to meet step two burden, but mere conjecture is insufficient).

Here, the prosecutor was not required to provide his actual reasons for the strikes because the trial judge found that petitioner had not established a prima facie case of discrimination.   (See RT at 496 & 546).   In addition, the trial judge conducted all of the questioning of the prospective jurors; neither defense counsel nor the prosecutor asked any questions of the venire members.

1   (See, generally, id. at 303-690; accord 1 ERT at  110; 2 ERT at 14).  "Although a prosecutor's

2   questions might provide some evidence of the prosecutor's actual reasons for striking a juror, we

3   are not presented with that issue in this case."  Paulino II, 542 F.3d at 700 n. 8.

4   　　　　Because the state courts never went beyond step one of the Batson inquiry, the court

5   conducted an Evidentiary Hearing to allow the prosecutor "to explain h[is] actual motivations for

6   h[is] peremptory challenges."[15]  Paulino I, 371 F.3d at 1092; see also Williams, 432 F.3d at 1109-

7   10 (remanding to the district court to conduct an evidentiary hearing after finding that petitioner

8   raised a plausible inference of discrimination); Turner I, 63 F.3d at 814 (same).  An evidentiary

9   hearing can be used to "reconstruct" the prosecutor's actual reasons for striking the jurors in

10  question.  See Paulino II, 542 F.3d at 700 (describing a "reconstruction" Batson hearing as "an

11  evidentiary hearing that takes place some time after the trial, where the prosecutor testifies to her

12  actual reasons for striking the venire-members in question").

13  　　　　The Evidentiary Hearing was held on February 27 and 28, 2007.  (See 1 ERT at 1; 2 ERT

14  at 1).  The prosecutor who tried petitioner's case in the state court was respondent's sole witness.

15  (See 1 ERT at 103-216; 2 ERT at 1-85).  The court also heard testimony from two venire members

16  to clarify their racial identities, petitioner's co-defendant's trial counsel, and an investigator and a

17  paralegal from the  Federal Public Defender's office.  (See  1 ERT at 15-102).  Petitioner and

18  counsel for both parties were present.  (See id. at 4; 2 ERT at 4).

19  　　　　The prosecutor testified that he had no independent recollection as to his actual reasons

20  for striking any of the jurors in question.  (See 1 ERT at 110, 117-18, 126-28, 131-33, 135, 137-41,

21  144, 147-52, 158-59, 194-95 & 200-01; 2 ERT at 5-6, 8-10, 14, 21, 23, 27, 37-39 & 50).  The court

22  offered the  prosecutor several  opportunities  to  clarify the  record  as to  whether  he  had  any

23  independent or refreshed recollection of his reasons for striking the jurors in question:

24

25

26  　　　　[15] Although at the time the court ordered the Evidentiary Hearing it had not made a
    determination as to whether petitioner met step one under Batson, the court nevertheless
27  concluded that judicial economy would be well served because "the burden of explaining the
    reasons for a challenge – in the alternative to arguing that no explanation is required – is minimal."
28  Collins, 551 F.3d at 927 (Graber, J., concurring).

| | | |
|---|---|---|
| 1 | [Court]: | Can you try to be a little bit more clear, and . . . indicate whether or not |
| 2 | | your memory has been refreshed based on [your notes], or are you |
| 3 | | just testifying as to what [the note] says[?] . . . |
| 4 | [Prosecutor]: | Yeah, it refreshes my memory as far as I wrote down notes that [Juror |
| 5 | | No. 7947] gave particular responses.  [¶]  If you are asking me do I |
| 6 | | have an image of who [Juror No. 7947] is in my mind, I have an |
| 7 | | impression of who she is from my notes.  Do I remember what she |
| 8 | | looked like or who she was?  I can't say that I remember that at |
| 9 | | all. . . . |
| 10 | [Court]: | Do you have – as you sit here today, do you have any – based on |
| 11 | | your notes, any recollection as to why you would have exercised a |
| 12 | | peremptory challenge at that time against [Juror No. 7947] based on |
| 13 | | your review of the notes and the transcript? . . . |
| 14 | [Prosecutor]: | What I would say is I don't have an independent memory of what was |
| 15 | | going on right at that moment.  When I look at the notes it's clear to |
| 16 | | me why I <u>would</u> have excused this juror, <u>but I can't say that I</u> |
| 17 | | <u>remember what I was thinking when I actually did it.</u> |
| 18 | | *       *       * |
| 19 | | I don't have an independent recollection of [Juror No. 1512], but I did |
| 20 | | read over this transcript, and I remember her responses as they are |
| 21 | | recorded in the transcript and the Court's comment about her smiling. |
| 22 | | *       *       * |
| 23 | | I don't have any independent memory of [Juror No. 1512's] body |
| 24 | | language and stuff, but that <u>might</u> have been a factor as well, because |
| 25 | | of that, looking at her responses [in the transcript] and the |
| 26 | | equivocation she has in her responses. |
| 27 | | *       *       * |
| 28 | | |

1          I don't know if [Juror No. 1508's name] was negative or positive or it

2          was something that stuck out for me. . . . I can't say I remember

3          specifically why I [wrote down her name].

4    [Court]:     You don't need to speculate.

5                              *        *        *

6    [Counsel]:   And do you have an independent recollection that [Juror No. 1508] is

7                 reading a book, or is it just what you see in the transcript?

8    [Prosecutor]: It's what I read the transcript.

9    [Counsel]:   You don't have any independent recollection of that?

10   [Prosecutor]: No. . . . I just know when I read in the transcript.

11                             *        *        *

12   [Court]:     Do you have an independent recollection [of the trial court asking

13                questions of Juror No. 1512]?

14   [Prosecutor]: I don't independently recollect the moment that it happened.   My

15                impression would be, from reading the transcript and having a feeling

16                from the transcript, you know, what would be normal conduct to a

17                normal question by a judge in relationship to what I see written down

18                there.

19                             *        *        *

20                I am reading the transcript now.  But, other than that, I don't have an

21                independent recollection.

22                             *        *        *

23                I guess I could make some guesses as to –

24   [Court]:     We are not asking you to guess. . . .

25   [Counsel]:   . . . But you don't have any independent recollection [of the racial

26                makeup of the voir dire]?

27   [Prosecutor]: No.

28

1   (1 ERT at 127-28, 132-33, 139, 144, 147-48 & 200-01; 2 ERT at 8-9, 27 & 38-39) (emphasis

2   added); (see also 1 ERT at 137-38 (prosecutor confirming that he did not have an independent

3   recollection as to why he excused Juror No. 7947) & 151-52 (prosecutor confirming that he did not

4   have an independent recollection as to why he excused Juror No. 1508); 2 ERT at 8 (prosecutor

5   confirming that reviewing his notes and voir dire transcript did not refresh his recollection) & 23

6   (same)).   Not only did the prosecutor not have any independent recollection as to his actual

7   reasons for striking any of the subject jurors, he testified that, even after reading the voir dire

8   transcript and reviewing his contemporaneous notes from the trial, he had no independent

9   recollection of the venire members.  (See 1 ERT at 117-18) ("[Question:] Now after reviewing the

10  reporter's transcript of the voir dire or particular sections of the voir dire and your notes, do you

11  have any specific recollection of the jurors in the trial? [¶]  [Answer:] I can't say it's a specific

12  recollection in my mind. . . .  It kind of gives me a picture of who the person is, but I can't say that

13  I remember them, the actual person.").

14       "Where the State has put forward a race-neutral reason at step two, the court evaluates all

15  relevant circumstances at step three, including whether the state's stated reasons are pretextual,

16  to decide whether a preponderance of the evidence establishes purposeful discrimination."

17  Paulino II, 542 F.3d at 702 (internal citation omitted).  Here, instead of providing his actual

18  nondiscriminatory reasons for striking the subject jurors, the prosecutor speculated, based on his

19  review of his notes and the voir dire transcript – neither of which refreshed his recollection[16] – as

20  to why he would have excused the jurors in question.[17]  (See 1 ERT at 110, 117-18, 126-28, 131-

21  _____

22       [16] The only independent recollection that the prosecutor had of the voir dire was a "faint
    recollection" of Juror No. 1508 discussing her ex-husband.  (See 1 ERT at 146) ("That was in
23  reference to her ex-husband, and that is something that actually I do have a faint recollection of.
    I remember some discussion about that.  I kind of remember it was like people laughed, but it was
24  kind of like she made a little bit of a show when she made a comment about it.").  However, the
    prosecutor also indicated that he did not have an independent recollection as to why he excused
25  Juror No. 1508.  (See id. at 151-52).

26       [17] The prosecutor also testified as to his general principles and strategies of jury selection.
    (See 1 ERT at 125-26, 159-61 & 141-42; 2 ERT at 15).  However, the prosecutor also indicated
27  that his jury selection principles and strategies have changed over time and that he could not recall
28  whether he used or applied any particular principle during petitioner's trial.  (See 2 ERT at 37-38).

33, 135, 137-41, 144, 147-52, 158-59, 194-95 & 200-01; 2 ERT at 5-6, 8-10, 14, 21, 23, 27, 37-39

& 50).  However, apparent or potential reasons based on what the prosecutor's reasons may have

been in light of the transcript and his notes are insufficient to shed any light on the prosecutor's

intent.  See Paulino II, 542 F.3d at 699; Riley v. Taylor, 277 F.3d 261, 282 (3d Cir. 2001) (en banc)

("Apparent or potential reasons do not shed any light on the prosecutor's intent[.]").  As the Ninth

Circuit stated in Paulino II, "the difficulty here is that the state court trial judge did not require the

prosecutor to explain the strikes, and when asked at the evidentiary hearing in [this court], the

prosecutor had no [independent] recollection of h[is] actual reasons."  542 F.3d at 700.  All the

prosecutor could do was speculate about why he may have struck the jurors in question.  See id.

        Under the circumstances, having observed the prosecutor's testimony and reviewed the

record, the court concludes that the evidence produced at the Evidentiary Hearing was insufficient

to meet the prosecutor's burden at step two.  Where, as here, the state has not put forth an actual

reason, "[s]uch a failure . . . is evidence of discrimination."  Paulino II, 542 F.3d at 702 (internal

quotation marks and citation omitted) (brackets in original).  As the Ninth Circuit stated in Paulino

II, "[w]here the state fails to meet its burden of production, the evidence before the district court

at step three – the prima facie showing plus the evidence of discrimination drawn from the state's

failure to produce a reason – will establish purposeful discrimination by a preponderance of the

evidence in most cases.  Indeed, in such cases, there is no race-neutral evidence to weigh."  Id.

at 703.

        Nevertheless, the court must proceed to step three, even though the prosecutor did not

meet his burden at step two.  See Paulino II, 542 F.3d at 701-02 (where prosecutor's explanations

for his strikes were mere speculation and failed to satisfy step two burden of production, the court

must continue to step three); Yee, 463 F.3d at 901 (A "failure to provide an explanation for

---

Under the circumstances, the court is unwilling to consider whether the prosecutor's general
principles of jury selection constitute competent evidence where, as here, there is no affirmative
evidence that the prosecutor applied any of his general principles or strategies in striking a specific
juror.  Cf. Paulino II, 542 F.3d at 701 n. 10 (Ninth Circuit "has not addressed whether a list of
standard considerations, absent affirmative evidence that they were used in the particular case
in question, is competent evidence of a prosecutor's actual reasons for striking certain jurors.").

1   exercising a strike does not relieve the . . . court of its responsibility to make the ultimate

2   determination of whether there has been purposeful discrimination."); see also Johnson, 545 U.S.

3   at 171, 125 S.Ct. at 2417 (The "burden of persuasion rests with, and never shifts from, the

4   opponent of the strike.") (internal quotation marks and citation omitted).  Also, the prosecutor's

5   notes and the voir dire transcript – even though they do not refresh his recollection, (see 1 ERT

6   at 110, 117-18, 126-28, 131-33, 135, 137-41, 144, 147-52, 158-59, 194-95 & 200-01; 2 ERT at

7   5-6, 8-10, 14, 21, 23, 27, 37-39 & 50) – arguably constitute circumstantial evidence that the court

8   considers in making its determination as to whether petitioner has satisfied his burden of showing

9   discrimination.  Cf. Bui, 321 F.3d at 1317 ("It is of course permissible for a trial judge to turn to

10  circumstantial evidence to support an inference that a race-neutral reason underlies a particular

11  strike, despite the lack of any explicit race-neutral explanation from the State.").

12      F.      Step Three.

13      Even though the prosecutor testified that he had no independent recollection of his actual

14  reasons for striking any of the subject jurors, (see 1 ERT at 110, 117-18, 126-28, 131-33, 135,

15  137-41, 144, 147-52, 158-59, 194-95 & 200-01; 2 ERT at 5-6, 8-10, 14, 21, 23, 27, 37-39 & 50),

16  he nevertheless put forth reasons – which the court is persuaded are no more than speculation

17  – as to why he may have struck the subject jurors.[18]  (See 1 ERT at 126-38, 140-44 & 145-53).

18  Respondent also assumed that the prosecutor's speculative reasons qualify as circumstantial

19  evidence of the prosecutor's actual reasons.   (See Resp's Memo at 17-33) (discussing

20  prosecutor's speculative reasons in both step two and step three analysis).  However, no authority

21  supports respondent's assumption that pure speculation qualifies as circumstantial evidence of

22  the prosecutor's actual reasons, simply because it was the prosecutor himself who offered the

23  _____

24      [18] After carefully observing and reviewing the prosecutor's testimony, the court is persuaded
    that the prosecutor formulated his reasons for striking the subject jurors based on his review of
25  the voir dire transcript and his contemporaneous notes, and not on the basis of his independent
    recollection.  (See, e.g., 1 ERT at 139 ("I don't have an independent recollection of [Juror No.
26  1512], but I did read over this transcript, and I remember her responses as they are recorded in
    the transcript and the Court's comment about her smiling."), 150 ("I recall reviewing the transcript
27  the other day[.]") & 200-01 (prosecutor confirming that his only recollection is what he read in the
    transcripts)).
28

34

1   speculation during the course of an evidentiary hearing.  See Paulino II, 542 F.3d at 701.  In any

2   event, the court will assume, for purposes of this discussion, that the prosecutor's speculative

3   reasons for striking the subject jurors were his "actual" reasons.  As the court concludes below,

4   even the prosecutor's speculative reasons for striking the subject jurors were pretextual.

5            **1.     Legal Standard**.

6            "The first two *Batson* steps govern the production of evidence that allows the trial court to

7   determine the persuasiveness of the defendant's constitutional claim."  Johnson, 545 U.S. at 171,

8   125 S.Ct. at 2417-18 (italics in original).  "It is not until the *third* step that the persuasiveness of

9   the [prosecution's] justification becomes relevant – the step in which the trial court determines

10  whether the opponent of the [peremptory] strike has carried his burden of proving purposeful

11  discrimination."  Purkett, 514 U.S. at 768, 115 S.Ct. at 1771 (italics in original).  At step three, the

12  trial court must evaluate "the persuasiveness of the justification[s]" offered by the prosecutor to

13  determine whether race was a substantial or motivating factor.  See Kesser, 465 F.3d at 359;

14  Cook v. LaMarque, 593 F.3d 810, 815 (9th Cir. 2010) ("[W]e reject the district court's mixed-

15  motives analysis, and limit our inquiry to whether the prosecutor was 'motivated in substantial part

16  by discriminatory intent.'") (quoting Snyder v. Louisiana, 552 U.S. 472, 485, 128 S.Ct. 1203, 1212

17  (2008)).   As the Supreme Court stated in Miller-El 1,

18            the critical question in determining whether a prisoner has proved purposeful

19            discrimination at step three is the persuasiveness of the prosecutor's

20            justification for his peremptory strike. . . . [T]he issue comes down to whether

21            the trial court finds the prosecutor's race-neutral explanation to be credible.

22            Credibility can be measured by, among other factors, the prosecutor's

23            demeanor; by how reasonable, or how improbable, the explanations are; and

24            by whether the proffered rationale has some basis in accepted trial strategy.

25  537 U.S. at 338-39, 123 S.Ct. at 1040 (explaining Purkett, 514 U.S. at 768, 115 S.Ct. at 1771).

26  "When conducting the analysis at the third step, the trial court must decide not only whether the

27  reasons stated are race-neutral, but whether they are relevant to the case, and whether those

28  stated reasons were the prosecutor's genuine reasons for exercising a peremptory strike, rather

1   than pre-texts invented to hide purposeful discrimination." Green v. LaMarque, 532 F.3d 1028,

2   1030 (9th Cir. 2008, as amended Aug. 4, 2008).

3        "Although the burden remains with the defendant to show purposeful discrimination, the

4   third step of Batson primarily involves the trier of fact." Kesser, 465 F.3d at 359 (italics in original).

5   In conducting the step three analysis, the court "must evaluate the record and consider each

6   explanation within the context of the trial as a whole because '[a]n invidious discriminatory purpose

7   may often be inferred from the totality of the relevant facts.'" Id. (quoting Hernandez v. New York,

8   500 U.S. 352, 363, 111 S.Ct. 1859, 1868 (1991)) (other internal quotation marks and citation

9   omitted).  In considering the "totality of the relevant facts," the court must "must review the record,"

10  including the prosecutor's statements and his or her explanations for the peremptory strikes, voir

11  dire transcripts and venire members' questionnaires, to determine if a prosecutor's reasons for

12  exercising a peremptory challenge are pretextual.  Id. at 360 & 371 (internal quotation marks and

13  citation omitted).

14       In addition, in undertaking its inquiry into such circumstantial and direct evidence of intent

15  as may be available, see Batson, 476 U.S. at 93, 106 S.Ct. at 1721, the court may conduct "side-

16  by-side comparisons" of the black panelists who were struck and nonblack panelists who were

17  allowed to serve.[19]  See Miller-El 2, 545 U.S. at 241, 125 S.Ct. at 2325 (finding that side-by-side

18  _____

19       [19] The Ninth Circuit has concluded that the Supreme Court's use of comparative analysis
    in Miller-El 2 was merely a clarification of Batson's step three framework.  See Boyd, 467 F.3d at
20  1146 ("[I]f the Supreme Court's endorsement of comparative juror analysis on appeal constituted
    a new procedural rule, the Court would not have applied that rule to Miller-El, whose case came
21  before the Court on an appeal from a denial of habeas corpus.  Because the Court did engage in
    extensive comparative juror analysis, we can infer that Miller-El II must only have clarified the
22  extant Batson three-step framework.") (italics in original) (internal citation omitted).  Therefore, the
    use of comparative juror analysis to evaluate Batson claims is based on clearly established federal
23  law, which was in existence by the time of petitioner's last reasoned state court decision in 2001.
    See Kesser, 465 F.3d at 360 ("The Court's . . . principles expounded in Miller-El were clearly
24  established Supreme Court law for AEDPA purposes at least by the time of the last reasoned state
    court decision in Miller-El, handed down in 1992, before Kesser's 1993 trial.") (italics in original);
25  Boyd, 467 F.3d at 1150 ("[U]nder the clearly established Supreme Court precedent of Batson,
    comparative juror analysis is an important tool that courts should utilize on appeal when assessing
26  a defendant's plausible Batson claim[.]") (italics in original).  In the instant case, as noted earlier,
    the state courts' failure to conduct a comparative juror analysis requires this court to perform one
27  de novo.  See Green, 532 F.3d at 1031 (A federal habeas court "must conduct [the comparative

28

36

comparisons of minority venire members who were struck and nonminority venire members allowed to serve are more powerful than bare statistics); Cook, 593 F.3d at 815. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Miller-El 2, 545 U.S. at 241, 125 S.Ct. at 2325 (italics in original).

### 2.    Juror No. 1508.

To the general questions asked of each prospective juror during voir dire,[20] Juror No. 1508 responded:

> I live in Beverly Hills.

> I'm a make up artist.

> I'm not married.

> I have never served on a jury.

> I know no one in law enforcement.

(RT at 505).  Juror No. 1508 expressed an interest in starting her own business.  (Id. at 504-05). She stated that her ex-husband was in the military but could not remember his job because she prefers "not to remember anything about the past."  (Id. at 505-06).  She also stated that her aunt was in jail on a DUI charge.  (Id. at 506-07).

According to the prosecutor, his contemporaneous notes indicate that:

> [Juror No. 1508] lived in Beverly Hills, that she worked doing hair,
> makeup, et cetera, . . . small business, makeup artist, so that she was
> basically in the business of, I guess, doing makeup.

---

juror] analysis de novo, rather than remanding for the state courts to do so.") (italics in original); Kesser, 465 F.3d at 361 ("[I]n Miller-El [2], the Court made clear that the comparative analysis is required even when it was not requested or attempted in the state court.") (italics in original).

[20] While the voir dire transcript does not include the exact questions, it appears that each prospective juror was asked: (1) where do you live; (2) what is your occupation; (3) are you married and if so, what is your spouse's occupation; (4) do you have any children and, if they are adults, what is their occupation; (5) do you have any prior jury experience; and (6) do you have friends or family in law enforcement?  (See, e.g., RT at 345-61).

1            She was single.  She was divorced from somebody in the Army.  No

2    kids, no prior jury experience.  I have the word "young" written and circled,

3    which when I was looking at this my thought is that, that is probably based

4    on the way that she presented herself rather than apparent age, because I

5    don't usually indicate somebody's apparent age.

6            She indicates she had an auntie that was in jail for DUI. . . .  [T]he

7    Court asked her about her first name, and she indicated it was a Swahili

8    name.  I think these are hobbies that are written in here, that she liked to

9    shop and buy clothing.

10   (1 ERT at 145-46).   The prosecutor's notes also included a boxed-in comment, "try not to

11   remember," which the prosecutor explained "was in reference to [Juror No. 1508's] ex-husband[.]"

12   (Id. at 146).

13           During the Evidentiary Hearing, the prosecutor gave four reasons for challenging Juror No.

14   1508: (1) she was shallow and superficial; (2) she made a "show" of not remembering her ex-

15   husband's occupation; (3) she was reading during the voir dire; and (4) she had a close

16   relationship with her aunt, who was in jail on a DUI conviction.[21]   (See 1 ERT at 145-53).

17   Specifically, the prosecutor indicated that he excused Juror No. 1508 because

18           when I look at the notes and I look at the – what her job was, her profession

19   was, that she's single, no kids, no prior experience, and the fact I've written

20   the word 'young,' which to me indicates that she probably presented herself

21   as somewhat immature.

22           I think probably my main reason, the main impression of this juror was

23   somebody that was somewhat shallow or superficial; again, a lack of life

24   _____

25   [21] Although respondent claims that Juror No. 1508 was stricken because she had no prior

26   jury experience, (see Resp's Memo at 22-23) (citing 1 ERT at 152-53), the prosecutor did not
     testify to lack of jury experience as one of his reasons for striking this juror.  (See, generally, 1

27   ERT at 152-53).  In any event, even assuming lack of jury experience was one of the reasons the
     prosecutor gave for striking Juror No. 1508, the reason is insufficient given the comparative juror

28   analysis performed with respect to Juror No. 1512.  See infra at § II.F.3.

> experience, not somebody that was really going to get the issues involved in
> a gang case[.] . . .  My point is that [she's] not the type of juror that would
> understand the gang context and the issues involved in that.  [She] was
> somebody that was more into fashion and makeup and shopping in Beverly
> Hills. . . .  And, again, obviously I think that the fact that she visited an aunt –
> had an aunt that was in jail that was in trouble.

(Id. at 152-53).  The prosecutor recalled that Juror No. 1508 "made a little bit of a show" of trying not to remember any details about her ex-husband's occupation.  (Id. at 146).  The prosecutor was also concerned that the judge had to ask Juror No. 1508 to put a book down.  (See id. at 149) ("And that would have been a factor that would have probably given an impression on me, probably a negative impression.").  Finally, the prosecutor reiterated that Juror No. 1508's

> aunt was in jail [for a DUI] and apparently her aunt's sister[] died and it looks
> like [Juror No. 1508 and her mother] went . . . to get her out of custody so
> she could attend the funeral[.] . . .  It was somebody that she's close enough
> to, to go and help make arrangements for her for the funeral and so
> somebody that may cause her to sympathize with the accused and
> somebody that's charged with a crime.

(Id. at 151).

As an initial matter, during the Evidentiary Hearing, the prosecutor indicated that he did not have an independent recollection as to why he excused Juror No. 1508.  (See 1 ERT at 151-52).  In any event, a review of the record refutes the prosecutor's stated nonracial grounds for striking Juror No. 1508.  First, the prosecutor's assertion that he dismissed Juror No. 1508 because she was "somewhat shallow or superficial[,] . . . [with] a lack of life experience, . . . [because she] was more into fashion and makeup and shopping in Beverly Hills[,]" (id. at 152), is not credible.[22]  If the

---

[22] To the extent the prosecutor's "lack of life experience" rationale is based on the fact that Juror No. 1508 is single and does not have any children, (see 1 ERT at 145 & 152; Resp's Memo at 22-23), the prosecutor, as discussed below, accepted other jurors who were single and did not have children.  See infra at § II.F.3.

1    prosecutor truly believed that Juror No. 1508 was a poor juror for the prosecution because she is

2    "shallow or superficial," he would have challenged Juror No. 8235, who was into shopping and

3    fitness magazines; Juror No. 8116, who was into shopping; Juror No. 8193, who has no hobbies

4    or outside activities and does not read; Juror No. 0733, who has no hobbies; and Juror No. 4516,

5    who was into cross stitching and animals.  (See RT at 337, 464, 481, 515 & 540).  Indeed, Juror

6    No. 1508 appeared to be more "mature" than some of the jurors accepted by the prosecutor.  For

7    example, Juror No. 1508 was reading a book about how to start a business and planned to use

8    her experience in hair and makeup to open her own business.  (See RT at 504-05).  Further, to

9    the extent the prosecutor rejected Juror No. 1508 as young "based on the way that she presented

10   herself rather than apparent age,"[23] (1 ERT at 146), such a rationale is so undeveloped that it falls

11   short of Batson's mandate for a "clear and reasonably specific explanation of [the] legitimate

12   reasons for exercising the challenge[]."  476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20 (internal

13   quotation marks and citation omitted).

14        Second, the prosecutor's comment that Juror No. 1508 "made a little bit of a show" of trying

15   not to remember any details of her ex-husband's specific job when he was in the military, (see 1

16   ERT at 146), is not credible.  See Miller-El 1, 537 U.S. at 339, 123 S.Ct. at 1040 ("Credibility can

17   be measured by, among other factors, . . . how reasonable, or how improbable, the explanations

18   are; and by whether the proffered rationale has some basis in accepted trial strategy.").  Although

19   the prosecutor had a "faint recollection" that people laughed at Juror No. 1508's reference to her

20   ex-husband, (see 1 ERT at 146) ("That was in reference to [Juror No 1508's] ex-husband, and that

21   is something that actually I do have a faint recollection of.  I remember some discussion about

22   that.  I kind of remember it was like people laughed, but it was kind of like she made a little bit of

23

24        [23] To the extent the prosecutor struck Juror No. 1508 because of her age, i.e., she was
     "young," (see, e.g., 1 ERT at 145-46 & 152-53), there was no evidence at the time of the voir dire
25   as to the age of Juror No. 1508 or, for that matter, the age of any of the jurors.  (See, generally,
     RT at 303-690).  However, as part of the Evidentiary Hearing, petitioner submitted evidence that
26   Juror No. 1508, who was 28 years old when she was struck from the panel, was close in age to
     five other jurors who sat on the trial: Juror No. 8235 was 31; Juror No. 8116 was 29; Juror No.
27   7090 was 23; Juror No. 3682 was 30; and Juror No. 8535 was 34.  (See Evidentiary Hearing Exhs.
     5 & 7); (see also 1 ERT at 68-69 & 73) (admitting Exhibits 5 and 7 into evidence).
28

1   a show when she made a comment about it."), the voir dire colloquy to which the prosecutor
2   refers, (see id. at 146-47), merely includes Juror No. 1508's testimony that she did not remember
3   her ex-husband's job when he was in the Army.  (See RT at 505-06) ("The Court: 'What was [your
4   ex-husband's] job [in the Army]?  Do you remember?' [¶]  [Juror No. 1508]: 'No.  I try not to
5   remember anything about the past.'").  Even if the prosecutor could establish that Juror No. 1508
6   "made a little bit of a show" in responding to the court's question about her ex-husband, the
7   prosecutor has not offered any explanation about how this would render her unsuitable for the jury.
8   (See, generally, 1 ERT at 146-47); see Kesser, 465 F.3d at 364 ("Even if the prosecutor could
9   establish that Rindels was unusually pretentious about her work, he offered no explanation about
10  how this would render her unsuitable for the jury."); Green, 532 F.3d at 1030 ("the trial court must
11  decide not only whether the [prosecutor's] reasons . . . are race-neutral, but whether they are
12  relevant to the case").

13          The prosecutor's third reason to challenge Juror No. 1508 – because "the judge asked her
14  to put [her] book down[,]" (1 ERT at 149) – is not supported by the record.  The prosecutor testified
15  that "[t]he fact that the Court asked [Juror No. 1508] to put the book down, or the fact that she was
16  looking at a book while the jury selection process was going on, . . . would be an indicator sort of
17  a lack of respect for the process and for the Court."  (Id. at 150).  As an initial matter, the
18  prosecutor's testimony with respect to whether he had any independent recollection of Juror No.
19  1508 reading a book during voir dire is inconsistent.  On the one hand, the prosecutor testified that
20  he recalled Juror No. 1508 reading a book during voir dire.  (See id. at 154).  On the other hand,
21  he testified that he did not have an independent recollection of Juror No. 1508 reading a book:

22          [Counsel]:      . . . And do you have an independent recollection that [Juror No. 1508]
23                          is reading a book, or is it just what you see in the transcript?
24          [Prosecutor]: It's what I read in the transcript.
25          [Counsel]:     You don't have any independent recollection of that?
26          [Prosecutor]: No. . . .  I just know when I read the transcript.
27          [Counsel]:     Do you remember if the book was open?
28

1  [Prosecutor]: Just what was in the transcript.  It indicates in the transcript, from the

2              way that I read it, that it appeared that she was reading it, or the judge

3              thought she was reading it.

4  [Counsel]:    But you don't have an independent recollection?

5  [Prosecutor]: No, I don't.

6  (Id. at 200-01).

7       In any event, the record indicates that the trial court's request to Juror No. 1508 to put her

8  book down occurred immediately after the court returned from a break and prior to the resumption

9  of jury selection.  (See RT at 519).  Under these circumstances, the prosecutor's stated concern

10 that Juror No. 1508 would be a poor juror because the trial court asked her to put her book down

11 is based on an unfounded characterization of the record.  See McClain v. Prunty, 217 F.3d 1209,

12 1221 (9th Cir. 2000) ("Where the facts in the record are objectively contrary to the prosecutor's

13 statements, serious questions about the legitimacy of a prosecutor's reasons for exercising

14 peremptory challenges are raised."); Johnson v. Vasquez, 3 F.3d 1327, 1331 (9th Cir. 1993), cert.

15 denied, 511 U.S. 1085, 114 S.Ct. 1838 (1994) ("When there is reason to believe that there is a

16 racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value

17 a list of neutral reasons that are either unsupported in the record or refuted by it.").

18      The prosecutor's fourth reason – that Juror No. 1508's relationship with her aunt might

19 "cause her to sympathize with the accused and somebody that's charged with a crime[,]" (1 ERT

20 at 151) – is also not supported by the record.  During the Evidentiary Hearing, the prosecutor

21 stated that Juror No. 1508 was close enough to her aunt to help get her out of custody to attend

22 the funeral of the aunt's sister.  (See id.).  The prosecutor's assertion, however, is not borne out

23 by Juror No. 1508's responses to the trial judge's questions.  Juror No. 1508 stated that she "just

24 went to take [her] mother to help get [the aunt] out due to the funeral arrangements. . . .  My

25 mother did everything.  [¶]  I basically just went along with her." (RT at 507); (see also id.) ("You

26 know, I'm so involved in my own life I really don't know what it was about except that she was in

27 jail.").  Further, she stated unequivocally that there was nothing "about her . . . aunt's situation[]

28 that . . . would influence [her] verdict one way or the other in this case." (Id.).  Again, the

1  prosecutor's reason is based on an unfounded characterization of the record.  The prosecutor's

2  mischaracterization of Juror No. 1508's statements provides further evidence of pretext.  See

3  Miller-El 2, 545 U.S. at 244, 125 S.Ct. at 2327 (mischaracterization of juror testimony is evidence

4  of discriminatory pretext); Ali v. Hickman, 584 F.3d 1174, 1192 (9th Cir. 2009, as amended Oct.

5  23, 2009), cert. denied, 130 S.Ct. 2065 (2010) ("the prosecutor once again mischaracterized

6  M.C.'s comments, thereby providing further evidence of pretext[]").

7       Finally, even though the prosecutor was not required to state his actual reasons for

8  exercising his peremptory strikes, the appellate court, upon its review of petitioner's appeal of the

9  trial court's finding of no prima facie case, put forth reasons to dismiss the subject jurors, stating

10 in relevant part:

11            Two of the challenged Black women had close relatives and friends

12        who were convicted of serious crimes during court proceedings attended by

13        the challenged jurors.  Their attendance at such hearings could reasonably

14        be construed as demonstrating support for their convicted friends and

15        relatives.  Such challenges by a prosecutor are demonstrably reasonable.

16        All the challenged jurors were young, a characteristic itself justifying excusal.

17        The other two jurors also lacked jury experience and worked at relatively

18        low-level jobs.  All those factors would support exclusion.

19 (Opinion at 122).  The appellate court's attempt to put forth its own reasons as to why the

20 prosecutor may have stricken any of the subject jurors is insufficient.

21      First, the appellate court put forth its reasons in the context of the trial court's finding that

22 petitioner had not made a prima facie showing of bias.  The prosecutor was never required to set

23 forth his actual reasons for striking any of the jurors in question.  Thus, it is implausible that such

24 reasons were a legitimate basis for the prosecutor to dismiss any of the subject jurors when those

25 reasons were not raised by the prosecutor himself.  Second, the Supreme Court has disapproved

26 a state court's attempt to substitute its own reasons in the Batson inquiry in this manner:[24]

27  _____

28       [24] Even assuming it was proper to consider the reasons expressed by the state appellate

1        [A] prosecutor simply has got to state his reasons as best he can and stand

2        or fall on the plausibility of the reasons he gives.  A *Batson* challenge does

3        not call for a mere exercise in thinking up any rational basis.  If the stated

4        reason does not hold up, its pretextual significance does not fade because

5        a trial judge, or an appeals court, can imagine a reason that might not have

6        been shown up as false.  The Court of Appeals's . . . substitution of a reason

7        for eliminating [the juror] does nothing to satisfy the prosecutors' burden of

8        stating a racially neutral explanation for their own actions.

9   Miller-El 2, 545 U.S. at 252, 125 S.Ct. at 2332 (italics in original); see also Gonzalez v. Brown, 585

10  F.3d 1202, 1209 n. 6 (9th Cir. 2009) (where the prosecutor offers no reasons, Miller-El 2 likely

11  would preclude the state appellate court from offering "a hypothetical justification" for the

12  prosecution's strike); Paulino I, 371 F.3d at 1090 ("[I]t does not matter that the prosecutor might

13  have had good reasons to strike prospective jurors.  What matters is the *real* reason they were

14  stricken.") (italics in original); Green, 532 F.3d at 1030 ("[T]he prosecutor is responsible for

15  articulating his own reasons for the challenges exercised. . . . [C]ourts must be careful not to

16  substitute their own speculation as to reasons why a juror might have been struck for the

17  prosecutor's stated reasons."); Williams, 432 F.3d at 1109 (reviewing courts' determination that

18

19  _____

20  court, none of them withstand scrutiny in light of the record.  The appellate court made no effort
    (or at least it did not specify) to evaluate each of its justifications individually; nor did it perform a

21  comparative juror analysis.  (See, generally, Opinion at 117-22).  Indeed, other than setting forth
    the reasons that justified the prosecutor's strikes in general, the appellate court did not indicate

22  which reasons justified the striking of any individual juror.  (See id.).  In any event, the appellate
    court provided four reasons to justify the prosecutor's peremptory strikes: (1) two jurors had no

23  jury experience; (2) all of them were young; (3) two had close relationships with relatives or friends
    who were convicted of serious crimes; and (4) two had "low level" jobs.  (Id. at 122).  The first

24  three reasons – to the extent they apply to any of the subject jurors – have been addressed in this
    Report and Recommendation.  See infra at § II.F.3. (addressing lack of jury experience); supra

25  at n. 23 & 43 (addressing young and relationship with relative convicted of crime).  With respect
    to the last reason – that two jurors had "low level" jobs – the jurors to which this reason applies

26  cannot be determined.  Nevertheless, even assuming this reason applied to any of the subject

27  jurors, the "low level" job rationale falls short of Batson's mandate for a "clear and reasonably
    specific explanation of [the] legitimate reasons for exercising the challenges."  476 U.S. at 98 n.

28  20, 106 S.Ct. at 1724 n. 20 (internal quotation marks and citation omitted).

"the record contained evidence for each juror that would support peremptory challenges on non-objectionable grounds . . . [did] not measure up to the Supreme Court's pronouncement that the question is not whether the prosecutor might have had good reasons, but what were the prosecutor's real reasons for the challenges[]") (citing Johnson, 545 U.S. at 172, 125 S.Ct. at 2418, and Miller-El 2, 545 U.S. at 252, 125 S.Ct. at 2332).

In sum, "an analysis of the totality of the relevant facts, including a comparison of [Juror No. 1508] to other potential and actual jurors, convincingly refutes each of the prosecutor's non-racial justifications for his peremptory challenge of [Juror No. 1508]." Ali, 584 F.3d at 1193 (internal quotation marks omitted).  The evidence in the record "is open to judgment calls, but when this evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination."  Miller-El 2, 545 U.S. at 265, 125 S.Ct. at 2339.  The court is therefore "compell[ed to conclude] that his actual and only reason for striking [Juror No. 1508] was her race."  Kesser, 465 F.3d at 360.

### 3.      Juror No. 1512.

To the general questions asked of each prospective juror during voir dire, Juror No. 1512 responded as follows:

> Los Angeles.

> Office Assistant.

> Single.

> Two children.

> No jury experience.

> No, I do not know law enforcement.

(RT at 452).  Juror No. 1512 stated that she had worked for the Los Angeles Unified School District for the previous 11 months and prior to that had worked for the California State Bar as a receptionist.  (See id. at 452-53).

According to the prosecutor, his contemporaneous notes indicate that:

> [Juror No. 1512] lived in Los Angeles, that she was an office assistant,
> she was single, had two kids, never married, no prior jury experience.   It

1          looks like she said something in regard to her son's being involved in sports.

2          No guns or contact with guns or ownership of guns.

3                It looks like her hobbies were to work out and to shop.  There is a

4          word on there that indicates nervous, all new, which this probably may have

5          been – was probably more of an impression than I don't know if it was

6          specifically in response to a question.

7    (1 ERT at 138-39).

8          The prosecutor gave four reasons for challenging Juror No. 1512: (1) she had been

9    employed in her present job for only 11 months; (2) she was single; (3) she lacked prior jury

10   experience; and (4) she was nervous and equivocal about whether or not she would be

11   comfortable sitting on a murder trial.  (See 1 ERT at 144).  Specifically, the prosecutor stated the

12   following with respect to Juror No. 1512:

13                It started off in the Court asking about the fact that she was smiling,

14          which is probably the fact that somebody is smiling as they are being

15          questioned on a murder case is sort of unusual behavior.  I would take that

16          as somewhat unusual behavior, and get some idea of why they are smiling,

17          whether they are nervous, or maybe they are a little goofy, or for whatever

18          the reason that they have a smile on their face when we are talking about a

19          murder case[.] . . .

20                [The judge] asked her, do you have any fear, nervousness or doubts;

21          and she said she was nervous.  He asked, is this about speaking or about

22          doing the case?  She said, doing the case.  [¶]  Ultimately, at the end of the

23          colloquy on that issue, . . . [Juror No. 1512 understood that she would have]

24          to make a decision in the case. . . .

25                But prior to that her answers and her indication that she was nervous

26          to me shows an unsureness about sitting on a case, on a murder case, an

27          equivocation about whether or not she can actually sit down and listen to the

28

1    evidence and make a decision.  So that would have been – definitely would

2    have been a concern for me.

3                                    *        *        *

4            In this case where she feels nervous already about sitting on a case

5    and making a decision, then if she's got no track record, no prior experience

6    being a juror, that would have concerned me. . . .

7            [The fact that she had two kids and she was not married or never

8    married,] that's not really a sort of a mainstream way of having a family.

9    Most people get married and then have kids.  So I would consider an

10   indication that she is – for whatever reason that happened, she's not

11   necessarily mainstream and may not show the same values as the

12   mainstream stake in society type that I'm looking for.

13                                   *        *        *

14           I think to me [the fact that she had worked at her present job for only

15   11 months] indicates a lack of life experience and a lack of the type of values

16   that I'm looking for where somebody has been faced with challenges and has

17   overcome those challenges and has some foundation, a work history where

18   somebody stays with the job and works there for a while and deals with

19   whatever challenges come along and is able to maintain that job along with

20   relationships and other aspects of life.  I think all of those are relevant to me

21   in terms of that person's life experience.

22   (Id. at 140-44).

23           As an initial matter, the prosecutor testified that he did not have an independent recollection

24   of Juror No. 1512 and that his recollection as to why he may have struck her was based on his

25   review of the voir dire transcripts.  (See 1 ERT at 139 ("I don't have an independent recollection

26   of [Juror No. 1512], but I did read over this transcript, and I remember her responses as they are

27   recorded in the transcript and the Court's comment about her smiling."), 150 ("I recall reviewing

28   the transcript the other day[.]") & 200-01 (prosecutor confirming that his only recollection is what

                                         47

1   he read in the transcripts)).  As noted earlier, neither the voir dire transcript nor the prosecutor's

2   notes refreshed his recollection as to his actual reasons for striking the jurors in question.  See

3   supra at § II.E.

4          In any event, a review of the record refutes all of the prosecutor's identified non-racial

5   grounds for the dismissal of Juror No. 1512.  First, the prosecutor's striking of Juror No. 1512

6   because her short tenure (11 months) at her current job reflects a lack of life experience and

7   appropriate values, (see 1 ERT at 143-44; RT at 452-53), is undermined by the prosecutor's failure

8   to take into account that Juror No. 1512 had previously worked for the State Bar of California.

9   (See RT at 453).  Further, the prosecutor made no effort to have the trial court determine why

10  Juror No. 1512 had changed jobs or how long she had worked at her previous job.  (See,

11  generally, id. at 448-55).   The prosecutor's failure to seek clarification "undermines the

12  persuasiveness of the claimed concern."  Miller-El 2, 545 U.S. at 250 n. 8, 125 S.Ct. at 2330 n.

13  8; see Green, 532 F.3d at 1033 ("The prosecutor's stated reason that Deborah P.'s five jobs

14  illustrated she could not get along well with others was undermined by the fact that he did not ask

15  her a single question about why she changed jobs."); Ali, 584 F.3d at 1188 ("An analysis of the

16  record supplies a third reason why the prosecutor's alleged concern with M.C.'s objectivity is

17  implausible: his failure to clear up any lingering doubts about M.C.'s objectivity by asking follow-up

18  questions."); Miller-El 2, 545 U.S. at 244, 125 S.Ct. at 2327 ("[W]e expect the prosecutor would

19  have cleared up any misunderstanding by asking further questions before getting to the point of

20  exercising a strike.").  Finally, the prosecutor offered no explanation as to why employment for 11

21  months would render Juror No. 1512 unsuitable for jury service in this case.  The prosecutor's

22  claim that Juror No. 1512's employment for 11 months with her then current employer reflects "a

23  lack of life experience and . . . type of values," (see 1 ERT at 140-44), is so undeveloped that it

24  likely falls short – especially when one considers that the prosecutor ignored the juror's previous

25  employment with the California State Bar – of Batson's mandate for a "clear and reasonably

26  specific explanation of [the] legitimate reasons for exercising the challenges."  476 U.S. at 98 n.

27  20, 106 S.Ct. at 1724 n. 20 (internal quotation marks and citation omitted).

28

1   The prosecutor's second reason for striking Juror No. 1512 was that, as a single mother,

2   she is not "mainstream" and does not have a stake in society. (See 1 ERT at 142). This reason

3   contradicts the prosecutor's subsequent assertion that people who have children have a stake in

4   society. (See id. at 159) (prosecutor testifying that "having kids and taking care of those kids and

5   worrying about those kids . . . cause a person to [have a] stake in society"); (accord id. at 175).

6   Further, a comparative juror analysis reveals that the prosecutor accepted jurors who were single

7   without children (Juror Nos. 8535, 6369, 0733, 9287 and 5767), married without children (Juror

8   Nos. 8235, 3682 and 4516) and divorced (Juror Nos. 5580 and 9003).[25] (See RT at 345, 348,

9   351, 470, 499, 516, 541, 560-61, 656 & 689). "The fact that [the prosecutor's] reason also applied

10  to these other panel members, [all] of them white, none of them struck, is evidence of pretext."

11  Miller-El 2, 545 U.S. at 248, 125 S.Ct. at 2330. Further, the claim that someone does not have

12  a "mainstream lifestyle" or that someone is out of the "mainstream" is so broad, vague and

13  amorphous that it can be used to justify just about any peremptory strike. See Burks v. Borg, 27

14  F.3d 1424, 1429 (9th Cir. 1994), cert. denied, 513 U.S. 1095, 115 S.Ct. 762, and cert. denied, 513

15  U.S. 1160, 115 S.Ct. 1122 (1995) ("We do not hold that a party's explanation for the exercise of

16  peremptory challenges will be insulated from appellate review so long as it is couched in vague

17  and subjective terms."). Again, the prosecutor's rationale is so undeveloped that it likely falls short

18  of Batson's mandate for a "clear and reasonably specific explanation of [the] legitimate reasons

19  for exercising the challenges." 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20 (internal quotation

20  marks and citation omitted).

21  The prosecutor's third reason for challenging Juror No. 1512 was because she lacked jury

22  experience. (See 1 ERT at 141-42). The prosecutor's concern about lack of jury experience is

---

24  [25] Although Juror No. 9003 was eventually struck by petitioner, (see RT at 562), comparative analysis is appropriate because petitioner did not make a decision to exercise a peremptory challenge of this juror until after the prosecutor accepted the panel. See Miller-El 2, 545 U.S. at 245 n. 4, 125 S.Ct. at 2328 n. 4 ("The fact that [particular] venire members discussed here were peremptorily struck by the defense is not relevant to our point. For each of them, the defense did not make a decision to exercise a peremptory until after the prosecution decided whether to accept or reject, so each was accepted by the prosecution before being ultimately struck by the defense."); (see also RT at 562) (prosecutor accepting the panel).

suspect when compared with the prosecutor's lack of concern over other jurors with no jury experience. Eight of the twelve jurors (and two of the three alternates) – Juror Nos. 8235, 8116, 4516, 5580, 7090, 3682, 8193, 8535, 9267 and 5767 – who made up the petit jury had no prior jury experience. (See RT at 345, 348, 464, 470, 483, 500, 541, 621, 654 & 689). Under the circumstances, a comparative juror analysis reveals the prosecutor's reliance on lack of jury experience as pretextual. See McClain, 217 F.3d at 1221 ("The prosecutor's last reason for excluding SR, and the sole reason the California appellate court upheld the trial court's decision, was that she lacked decision-making experience. This reason is revealed as pretextual upon conducting a comparative analysis of SR with another juror. Here, prospective Juror MG, a non-black juror, was impaneled even though he had never served on a jury and had no significant group decision-making experience."); see also Miller-El 2, 545 U.S. at 241, 125 S.Ct. at 2325 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.") (italics in original). Moreover, even assuming lack of jury service constituted a legitimate reason to strike Juror No. 1512, that is not, under the circumstances here, enough to convince the court that the prosecutor's reasons were race-neutral, for "if that was all the prosecutor had, it sounds pretty hollow." Kesser, 465 F.3d at 370 (finding the existence of only one legitimate reason out of five to strike a Native American juror – the length of her commute to the courthouse – weak); see also id. at 360 ("A court need not find all nonracial reasons pretextual in order to find racial discrimination. [I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons maybe deemed a pretext for racial discrimination.") (internal quotation marks omitted) (brackets in original).

Finally, the prosecutor's reason that he excused Juror No. 1512 because she was nervous and equivocal about whether or not she would be comfortable sitting on a murder trial, (see 1 ERT at 144), is not credible and wholly unpersuasive. "[N]ervousness cannot be shown from a cold transcript, which is why . . . the [trial judge's evaluation must be given much deference." Snyder, 552 U.S. at 479, 128 S.Ct. at 1209 (internal quotation marks and citation omitted) (brackets and

1   ellipses in original).  Of course, in this case, because the prosecutor was never required to state

2   his reasons for striking Juror No. 1512, the trial judge never made a determination with respect

3   to the prosecutor's demeanor-based explanation.  See Kesser, 465 F.3d at 356 ("The trial court

4   did not evaluate the sincerity of the prosecutor's nonracial reasons because it did not find any

5   racial animus that would prompt further inquiry."); see also Snyder, 552 U.S. at 477, 128 S.Ct. at

6   1208 ("[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g.,

7   nervousness, inattention), making the trial court's first-hand observations of even greater

8   importance."); cf. id. at 479, 128 S.Ct. at 1209 (holding that because peremptory challenge was

9   not exercised until some time after the juror was questioned, the court "cannot presume that the

10  trial judge credited the prosecutor's assertion that [the subject juror] was nervous" because the

11  trial judge might not have recalled the subject juror's demeanor).  During voir dire, Juror No. 1512,

12  in response to a question from the court, acknowledged her nervousness because jury service

13  was "new" for her.  (See RT at 449-50).  The court cannot believe this was a sincere reason for

14  striking Juror No. 1512 given that ten of the fifteen sworn jurors had never sat on a jury and most,

15  if not all, were probably "nervous" about sitting on a murder trial.   As the prosecutor himself

16  testified, it would be normal for someone to be nervous about sitting as a juror in a murder case.

17  (See 2 ERT at 45-48) (prosecutor acknowledging that it would be normal for someone to be

18  nervous about sitting as a juror in a murder case).  Nevertheless, the prosecutor made no attempt

19  during voir dire to have the court ask any of the other "novice" jurors whether they were nervous

20

21

22

23

24

25

26

27

28

1    about participating in a murder trial.[26]  (See, generally, RT at 303-690).  Indeed, Juror No. 1512

2    was the only juror that was asked whether she was nervous.[27]  (See, generally, id.).

3         Further, contrary to the prosecutor's assertion that Juror No. 1512 gave equivocal answers

4    about whether she could listen to the evidence and make a decision, (see 1 ERT at 141), the

5    record reveals that Juror No. 1512 unequivocally confirmed that she could hear the evidence and

6    render a decision:

7         [Q:]    Do you feel capable to resolve this case based on the evidence that you hear

8                 and the law that I give you?

9         [A]:    Yes.

10                                    *       *       *

11        [Q]:    Do you understand that you will be asked to deliberate and that means speak

12                about the evidence and the law with your fellow jurors at the end of the case

13                in an attempt to resolve the case.  [¶]  Will you have any problem doing that?

14        [A]:    No.

15        [Q]:    I mentioned some of the things that the jury cannot consider.  [¶]  The lady

16                next to you wanted to know about punishment and I told her that that is

17                something that the jury cannot consider in this case or any case in arriving

18                at a verdict.  [¶]  Any problem following that type of instruction?

19        [A]:    No.

20    _____

21        [26] During the hearing, the prosecutor indicated that the trial court did not allow counsel to
      ask any questions about particular issues.  (See 1 ERT at 110; 2 ERT at 14).  Although this may
22    be an attempt to insulate his challenges from one aspect of a comparative juror analysis, see, e.g.,
      Miller-El 2, 545 U.S. at 244, 125 S.Ct. at 2327 (prosecutor's explanation that a black juror was
23    struck for having reservations about the death penalty was implausible when non-black jurors who
      turned out to have stronger reservations were not questioned as probingly and accepted "with no
24    evident reservations"), there is nothing in the record indicating that counsel was prohibited from
      requesting that the court inquire or ask follow-up questions of the venire members.  (See,
25    generally, RT at 303-691).  In fact, the record indicates that, on a few occasions, the trial judge
      asked the attorneys if there were any areas they wanted him to ask questions about.  (See id. at
26    409-11).

27        [27] The record would be more complete and provide a better basis for comparison had the
28    trial judge asked all of the jurors whether they were nervous.

1     [Q]:    We summarized very briefly the concept of proof beyond a reasonable doubt.

2            [¶] Did you have any problem understanding that rule of law?

3     [A]:    No.

4     [Q]:    I also talked about a defendant's right not to testify and a defendant's right

5            to testify.  [¶] Did you hear me summarize those rules?

6     [A]:    Yes.

7     [Q]:    Any problem applying or understanding those rules?

8     [A]:    No.

9     [Q]:    Any question that you wish to ask about your duty or how the case will

10           proceed, et cetera?

11     [A]:    No.

12     [Q]:    Are you confident in your abilities to help us out here?

13     [A]:    Yes.

14 (RT at 451 & 453-55).  The prosecutor's mischaracterization of Juror No. 1512's statements as

15 being equivocal provides further evidence of pretext.  See Miller-El 2, 545 U.S. at 244, 125 S.Ct.

16 at 2327 (mischaracterization of juror testimony is evidence of discriminatory pretext); Ali, 584 F.3d

17 at 1192 ("the prosecutor once again mischaracterized M.C.'s comments, thereby providing further

18 evidence of pretext[]").  Finally, even assuming nervousness constituted a legitimate reason to

19 strike Juror No. 1512, that is not – given that many of the prosecutor's other proffered reasons

20 have been undermined by the record – enough to convince the court that the prosecutor's reasons

21 were race-neutral, for "if that was all the prosecutor had, it sounds pretty hollow."  Kesser, 465

22 F.3d at 370; see also id. at 360 ("A court need not find all nonracial reasons pretextual in order to

23 find racial discrimination. [I]f a review of the record undermines the prosecutor's stated reasons,

24 or many of the proffered reasons, the reasons maybe deemed a pretext for racial discrimination.")

25 (internal quotation marks omitted) (brackets in original).

26        In sum, "an analysis of the totality of the relevant facts, including a comparison of [Juror No.

27 1512] to other potential and actual jurors, convincingly refutes each of the prosecutor's non-racial

28 justifications for his peremptory challenge of [Juror No. 1512]."  Ali, 584 F.3d at 1193 (internal

quotation marks omitted).  The evidence in the record "is open to judgment calls, but when this evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination."  Miller-El 2, 545 U.S. at 265, 125 S.Ct. at 2339.  The court is therefore "compell[ed to conclude] that his actual and only reason for striking [Juror No. 1512] was her race."  Kesser, 465 F.3d at 360.

G.     Other Venire Persons.

Because the record compels a finding that the prosecutor's removal of Juror Nos. 1508 and 1512 was racially motivated, see supra at §§ II.F.2.-3., the court does not need to evaluate the validity of the prosecutor's peremptory challenges against any of the other jurors, including the Latino jurors.  See Ali, 584 F.3d at 1193.  The court, however, will briefly examine the prosecutor's justifications for challenging Juror No. 8731, a Latina, (see RT at 534, 538 & 543); see also Collins, 551 F.3d at 921 ("Striking members of more than one protected group is also relevant and may indicate discriminatory intent."), because it lends further support to the court's conclusion that the strikes of Juror Nos. 1508 and 1512 were racially motivated.  See Ali, 584 F.3d at 1193 ("As the record compels a finding that the prosecutor's removal of M.C. was racially motivated, we need not evaluate the validity of the prosecutor's peremptory challenge of Darrell Jefferson.  We do so briefly, however, because the weakness of at least two of the prosecutor's justifications for challenging Jefferson lends further support to our conclusion that M.C.'s strike was racially motivated."); Cook, 593 F.3d at 838 ("Because a single racial peremptory challenge calls for a retrial, we need not determine whether there was any genuine non-racial reason for striking each of the other potential African-American jurors.  Although the strikes exercised against [other] African-American venirepersons . . . are not as clear cut as that of Watkins, an examination of the explanations for these strikes further undermines the prosecutor's credibility and lends additional support to the conclusion that the strike of Watkins was racially motivated.") (internal citations omitted).  The striking of Juror No. 8731 makes it "even harder to believe that [the] reasons for striking [Juror Nos. 1508 and 1512] were race-neutral."  Kesser, 465 F.3d at 369 (collecting evidence of pretextual reasons to strike two Native American jurors, without deciding "whether

1    there was any genuine nonracial reason for striking each of these jurors[,]" in order to "undercut[]"

2    the prosecutor's credibility).

3           The prosecutor gave two reasons for challenging Juror No. 8731: (1) her long engagement;

4    and (2) she was reading a "light, shallow" Danielle Steele novel, which indicates a lack of life

5    experience. (See 1 ERT at 156-59). Specifically, the prosecutor indicated that he excused Juror

6    No. 8731 because

7                [s]he had indicated that . . . she wasn't going to actually get married for a

8                couple of years, that it was going to be a very long engagement, and the

9                Court questioned her about that. That's sort of an unusual thing. I don't

10                know that it was necessarily a negative or a positive, but it's definitely not

11                mainstream. Usually people get married relatively within a year after

12                engagement.

13                             *       *       *

14                Why [Juror No. 8731 reading Danielle Steele novels] would have been

15                relevant to me at the time is as far as I know they are romance, rather light,

16                shallow stories, and so that's some impression. That's one of the questions

17                that is asked often of jurors, what type of material they are currently reading,

18                or what they read.

19                You get some idea of what type of a thinker they are if they are

20                reading the Wall Street Journal or they are reading something that has a little

21                more substance to it. To me that's positive. It indicates that they are

22                somebody that has developed in terms of their intellectual life, and in terms

23                of life experience that they have, that they look at things a little deeper and

24                think a little deeper. [¶] To me, reading a Danielle Steele book, I guess, is

25                certainly not a factor by itself, but it is indicative of somebody that's maybe

26                a little bit more immature or less deep in their thinking process. . . .

27                [L]ooking at the notes and from having reviewed the transcript earlier,

28                I think with [Juror No. 8731] to me what stands out is, going back again to the

1   lack of life experience, which again is just a very important factor for me,

2   particularly in gang cases.

3   (Id. at 156 & 158-59) (underline in original).

4    The prosecutor's reason that the reading of a "light, shallow" Danielle Steele novel

5   indicates a lack of life experience, (see 1 ERT at 158), is suspect when compared with the

6   prosecutor's lack of concern with other jurors who also were interested in "light, shallow" activities

7   or who were not interested in any activities at all, irrespective of whether or not they were "light"

8   or "shallow."[28]   The prosecutor accepted Juror No. 8235, who was into shopping and fitness

9   magazines; Juror No. 8116, who was into shopping; Juror No. 8193, who has no hobbies or

10   outside activities and does not read; Juror No. 0733, who has no hobbies; and Juror No. 4516,

11   who was into cross stitching and animals.  (See RT at 337, 464, 481, 515 & 540); Miller-El 2, 545

12   U.S. at 241, 125 S.Ct. at 2325.

13    The prosecutor's second reason for striking Juror No. 8731 – because long engagements

14   are out of the mainstream, (see 1 ERT at 156) – is so underdeveloped that it falls short of Batson's

15   mandate for a "clear and reasonably specific explanation of [the] legitimate reasons for exercising

16   the challenge[]."   476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20 (internal quotation marks and

17   citation omitted).  The prosecutor did not explain how Juror No. 8731's long engagement would

18   render her unsuitable for the jury; nor did he explain how the long engagement "related to the

19   particular case to be tried."  Id. at 98, 106 S.Ct. at 1724.  In any event, there is simply no basis for

20   an inference that long engagements are out of the mainstream.   Moreover, the prosecutor

21   arguably contradicted himself when, during cross-examination, he acknowledged that someone,

22   like Juror No. 8731, who was unwilling to get married until she was financially stable,

23   demonstrated both responsibility and maturity.  (See 1 ERT at 206-07).  Finally, even assuming

24   a long engagement constituted a legitimate reason to strike Juror No. 8731, that would not be

25   enough to convince the court that the prosecutor's reasons were race-neutral, for "if that was all

26   ————————————

27    [28] A comparative juror analysis is probative even if a similarly situated nonminority juror is
not identical in all respects to a struck juror.  Miller-El 2, 545 U.S. at 247 n. 6, 125 S.Ct. at 2329

28   n. 6.

1   the prosecutor had, it sounds pretty hollow." <u>Kesser</u>, 465 F.3d at 370 (finding the existence of only

2   one legitimate reason out of five to strike a Native American juror – the length of her commute to

3   the courthouse – weak); <u>see</u> <u>also</u> <u>id.</u> at 360 ("A court need not find all nonracial reasons pretextual

4   in order to find racial discrimination.  [I]f a review of the record undermines the prosecutor's stated

5   reasons, or many of the proffered reasons, the reasons maybe deemed a pretext for racial

6   discrimination.") (internal quotation marks omitted) (brackets in original).

7   **CONCLUSION**

8       "Defendants are harmed, of course, when racial discrimination in jury selection

9   compromises the right of trial by impartial jury, but racial minorities are harmed more generally,

10   for prosecutors drawing racial lines in picking juries establish state-sponsored group stereotypes

11   rooted in, and reflective of, historical prejudice." <u>Miller-El 2</u>, 545 U.S. at 237-38, 125 S.Ct. at 2323

12   (internal quotation marks and citations omitted).  "[I]n considering a *Batson* objection, or in

13   reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue

14   of racial animosity must be consulted."  <u>Snyder</u>, 552 U.S. at 478, 128 S.Ct. at 1208 (italics in

15   original); <u>see</u> <u>Miller-El 2</u>, 545 U.S. at 239, 125 S.Ct. at 2324 ("[W]e . . . held [in <u>Batson</u>] that a

16   defendant could make out a prima facie case of discriminatory jury selection by 'the totality of the

17   relevant facts' about a prosecutor's conduct during the defendant's own trial.") (citation omitted).

18   Here, having conducted an Evidentiary Hearing and a <u>de novo</u> review of "all of the circumstances

19   that bear upon the issue of racial animosity," <u>Snyder</u>, 552 U.S. at 478, 128 S.Ct. at 1208, the court

20   finds that race was a substantial or motivating factor contributing to the prosecutor's exercise of

21   his peremptory challenges to Juror Nos. 1508 and 1512.[29]  First, the statistical data provides

22   evidence of racial discrimination in the prosecutor's use of his peremptory challenges.  <u>See</u> <u>supra</u>

23

---

24       [29] Even if petitioner's claim was reviewed under AEDPA's deferential standards, the court
is persuaded that the "state court's conclusion that the prosecutor['s] strikes of [Juror Nos. 1512

25   and 1508] were not racially determined is shown up as wrong to a clear and convincing degree;
the state court's conclusion was unreasonable as well as erroneous." <u>Miller-El 2</u>, 545 U.S. at 266,

26   125 S.Ct. at 2340.  Indeed, the court is persuaded that "the record [is] so strong on this point that

27   it cannot admit any other conclusion, and even satisfies the more demanding standard of rebutting
the presumption of correctness by clear and convincing evidence." <u>Kesser</u>, 465 F.3d at 368

28   (internal quotation marks and citations omitted); <u>see</u> 28 U.S.C. § 2254(e)(1).

1  at § II.D.; <u>Miller-El 2</u>, 545 U.S. at 240, 125 S.Ct. at 2325 (evidence of discriminatory intent includes

2  statistical data "describing the prosecution's use of peremptories"); <u>see</u> <u>also</u> <u>Batson</u>, 476 U.S. at

3  95, 106 S.Ct. at 1722 ("When circumstances suggest the need, the trial court must undertake a

4  factual inquiry that takes into account all possible explanatory factors in the particular case.")

5  (internal quotation marks and citation omitted).

6       Second, instead of putting forth his actual non-discriminatory reasons for exercising his

7  peremptory challenges, the prosecutor speculated as to his possible race-neutral reasons for

8  striking the jurors in question.  <u>See</u> <u>supra</u> at § II.E.  The prosecutor's speculative reasons are

9  insufficient to meet his burden at step two and "is evidence of discrimination." <u>Yee</u>, 463 F.3d at

10  900; <u>see</u> <u>supra</u> at § II.E.; <u>see</u> <u>also</u> <u>Paulino II</u>, 542 F.3d at 703 ("Where the state fails to meet its

11  burden of production, the evidence before the district court at step three – the prima facie showing

12  plus the evidence of discrimination drawn from the state's failure to produce a reason – will

13  establish purposeful discrimination by a preponderance of the evidence in most cases.  Indeed,

14  in such cases, there is no race-neutral evidence to weigh.").  Finally, even assuming the

15  prosecutor's speculative explanations at the Evidentiary Hearing were his actual reasons for

16  striking Juror Nos. 1508 and 1512, the court's step three analysis reveals that even the

17  prosecutor's reasons for striking Juror Nos. 1508 and 1512 were pretextual.  In short, because

18  even "one racial strike calls for a retrial," <u>Kesser</u>, 465 F.3d at 369, habeas relief should be granted

19  as to Ground One.

20       **This Report and Recommendation is not intended for publication.  Nor is it intended**

21  **to be included or submitted to any online service such as Westlaw or Lexis.**

22  **RECOMMENDATION**

23       Based on the foregoing, IT IS RECOMMENDED that the District Court issue an Order:

24       (1)    Accepting and adopting this Report and Recommendation;

25       (2)    Directing that judgment be entered granting the Petition as to Ground One and that

26  an Order be issued directing respondent to release petitioner unless the State of California elects

27  / / /

28  / / /

to grant petitioner a new trial within ninety (90) days.

Dated this 23rd day of July, 2010.


_____
/s/
Fernando M. Olguin
United States Magistrate Judge


## **NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number. No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.